**NATIONAL LABOR RELATIONS BOARD v. JARKA CORP. OF PHILADEL-PHIA et al.**

No. 10715.

United States Court of Appeals Third Circuit.

Argued June 18, 1952.

Filed Aug. 15, 1952.

Rehearing Denied Oct. 8, 1952.

Elizabeth W. Weston, Washington, D. C., (George J. Bott, Gen. Counsel, David P. Findling, Associate Gen. Counsel, A. Norman Somers, Assistant Gen. Counsel, Margaret M. Farmer, Washington, D. C., on the brief), for National Labor Relations Board.

Louis H. Wilderman, Philadelphia, Pa. (Richard H. Markowitz, Philadelphia, Pa., on the brief), for respondent Union.

Robert G. Kelly, Philadelphia, Pa., on the brief, for Jarka Corp. of Philadelphia.

Before MARIS, McLAUGHLIN and HASTIE, Circuit Judges.

HASTIE, Circuit Judge.

The National Labor Relations Board has petitioned this court, in accordance with Section 10(e) of the National Labor Relations Act (hereinafter called the Act), 49 Stat. 449 et seq. (1935), *as amended, 29* U.S.C.A. § 151 et seq., to enforce an order issued by the Board on separate charges and consolidated complaints against the Jarka Corporation of Philadelphia (hereinafter called Jarka) and Local 1291, International Longshoremen's Association (herein-

after called the union). On the basis of the evidence adduced at hearings before its trial examiner, the Board concluded that the respondents had committed certain unfair labor practices, Jarka by enforcing in violation of Section 8(a) (3), and the union by causing Jarka and other stevedoring companies to enforce in violation of Sections 8(b) (1) (A) and 8(b) (2), a policy of giving preference to union members in good standing in the employment of longshore workers. It found also that the respondents had thus discriminated against two individuals in particular, one a non-union employee and the other a union member delinquent in the payment of his union dues, Jarka by refusing, and the union by causing Jarka to refuse, to give them employment. The Board's order seeks to have respondents cease and desist from these unfair labor practices and take various affirmative steps in compliance therewith. The decision and order of the Board are reported at 94 N.L.R.B. 320.

As respondent here, Jarka has sought only an amendment to the enforcement order for purposes of clarification. However, the Board and Jarka have now reached a mutually satisfactory understanding based upon the Board's clarifying interpretation of its own order and no issue with respect to Jarka is left for us to determine. All that now remains in issue is whether the Board's findings in respect to the union were supported by substantial evidence on the record considered as a whole and whether these findings warranted the ultimate conclusion that the union had committed the unfair labor practices specified within the meaning of the Act.

Certain facts found by the Board are not disputed. Jarka, a Pennsylvania corporation, is one of several companies engaged in the business of stevedoring at the Port of Philadelphia, and the respondent union is the recognized collective bargaining agent for the longshore workers. Men are obtained for work each day by the companies at "shape-ups", a system of hiring whereby working crews are assembled and employed on a job-to-job basis. Pursuant to this arrangement, the particular needs of a company are communicated to the union which,

together with the company, shares the responsibility for posting that information at various places within the waterfront area. A company will then employ a hiring boss, both for the purpose of recruiting a specific crew from among those applicants who appear at a predesignated "shape-up" point, and for the purpose of acting thereafter as crew foreman until the work is completed.

■ Controverted are the Board's findings in accordance with the findings of its trial examiner that individuals Walker and Richardson were refused employment by Jarka's hiring bosses at and because of requests from elected officers of the respondent union known as union delegates. In the case of Walker, this conclusion was based solely on the testimony of Walker, himself, who was contradicted by Varlack, a union delegate. In the case of Richardson, the finding was based on the testimony of hiring boss Gibbs as well as Richardson, himself, who were contradicted by union delegate Kavalauskas. The trial examiner and the Board believed the complainants and Gibbs. Thus, the findings of fact made by the Board in respect to acts of discrimination by the union against these two individuals depend primarily upon judgment of credibility and should not be disturbed.

■ More generally, there is evidence that union delegates regularly appeared at "shape-ups" and there requested the hiring foreman to grant preference to union members. The union's assistant financial secretary admitted that union delegates "enforced" the "rule" that union men were to be hired first, and that nonunion men were permitted to finish out work for which hired "when our men are not available". In addition, three regular hiring bosses for Jarka, who were also members of the union, admitted that they generally hired union men first in accordance with the union rule. On the basis of this evidence, the findings of specific instances of union discrimination against individuals Walker and Richardson, and a consideration of the record as a whole, the Board found that union delegates followed the practice of "securing" preferential hiring for union men in good standing. Our independent examination of the record as a whole satisfies us that there was substantial evidence to support this finding.

We are confronted, finally, with the question whether the actions comprehended by the foregoing findings constituted unfair labor practices within the meaning of Sections 8(b)(1)(A) and 8 (b)(2) of the Act. The pertinent language of the Act is as follows:

"Section 8. (a) It shall be an unfair labor practice for an employer—

\* \* \* \* \* \*

"(3) by discrimination in regard to hire or tenure of employment or any term or condition of employment to encourage or discourage membership in any labor organization \* \* \*

\* \* \* \* \* \*

"(b) It shall be an unfair labor practice for a labor organization or its agents—

"(1) to restrain or coerce (A) employees in the exercise of the rights guaranteed in section 7 \* \* \*

"(2) to cause or attempt to cause an employer to discriminate against an employee in violation of sub-section (a) (3) \* \* \*."

Section 7, referred to in Section 8(b) (1) (A), *supra,* confers upon employees:

" \* \* \* the right to self-organization, to form, join, or assist labor organizations, to bargain collectively through representatives of their own choosing, and to engage in other concerted activities for the purpose of collective bargaining or other mutual aid or protection, and \* \* \* the right to refrain from any or all of such activities \* \* \*."

Do the findings in this case establish that the union "restrain[ed] or coerce[d]" employees in the exercise of their right to refrain from joining a labor organization, or that it "cause[d]" an employer to encourage union membership by discrimination against nonunion employees in regard to employment? The Board says that what the union did was an unfair labor practice on both counts. If it was on either, the Board's order should be enforced.

To avoid Section 8(b)(2) the union contends that the acts of its delegates amounted to no more than the utterance of "mere requests" for preferential consideration for union men, a form of "peaceful persuasion free of coercion", protected by Section 8(c), which provides that:

"The expressing of any views, argument, or opinion * * * shall not constitute or be evidence of an unfair labor practice under any of the provisions of this Act, if such expression contains no threat of reprisal or force or promise of benefit."

But we think an understandable and reasonable distinction can and should be drawn between such expressions of views as are protected generally by Section 8(c) and that exhortation of another to action which is intended to cause or does cause unlawful discrimination in hiring, a wrong prohibited by Section 8(b)(2). Relevantly and recently the Supreme Court has declared that, "The remedial function of § 8(c) is to protect noncoercive speech by employer and labor organization alike in furtherance of a lawful object. It serves that purpose adequately without extending its protection to speech or picketing in furtherance of unfair labor practices such as are defined in § 8(b)(4). The general terms of § 8(c) appropriately give way to the specific provisions of § 8(b)(4)." See International Brotherhood of Electrical Workers v. N.L.R.B., 1951, 341 U.S. 694, 704–705, 71 S.Ct. 954, 960, 95 L.Ed. 1299. Although that case involved picketing the court saw fit to define and limit the effect of Section 8(c) in terms of speech generally. Thus, what the court said gives impressive support to the position originally taken by the Board in Sub Grade Engineering Co., 1951, 93 N.L.R.B. 406, and now restated in the present case, that Section 8(c) is no bar to the application of Section 8(b)(2) according to its tenor.

Here there was an adequate showing that the union "caused" the employer to discriminate against employees as complained. This relationship of cause and effect, the essential feature of Section 8(b)(2), can exist as well where an inducing communication is in terms courteous or even precatory as where it is rude and demanding. In this case requests such as "don't carry [Walker]", "You can't carry [Richardson]", and "You got to take [a union man]", have the ring of telling rather than asking, but this is relevant only as emphasizing the reasonableness of the Board's findings that the employer acted as it did because the union called upon it to do so. It is essentially a question of fact in each case what has caused an employer to discriminate unlawfully against organized or unorganized workers. If the Board finds that the union accomplished this result by its acts, whether verbal or otherwise, the fundamental requirement of Section 8(b)(2) has been met. We are satisfied that Section 8(b)(2) prohibits the conduct of the union found by the Board in this case.

We are also asked to decide whether by causing the employer to discriminate against nonunion men, the union "restrained or coerced" the longshoremen themselves in the matter of union membership. The union contends that restraint and coercion as used in Section (8)(b)(1)(A) connote forceful action and direct dealing with the person allegedly restrained. The Board says it is enough that the indirect or ultimate effect of pressure on an independent third person is to impel the individual allegedly coerced toward some course of action. The answer to this is not obvious. The Board is mistaken in its view that an answer is to be found in our recent decision in N.L.R.B. v. Kingston Cake Co., 1951, 191 F.2d 563. And if technically this point may have been involved in cases before other courts of appeals it appears not to have been seriously contested. Certainly, the issue is not important to the decision of this case where the unfair practice complained of logically and more obviously comes under Section 8(b)(2). We understand that the Board would like to have two strings to its bow. But we have already tested the one string and have found it strong and entirely adequate. That, we think, is enough for this case. It seems better that judgment of the reach of Section 8(b)(1)(A) should be reserved for a case where power to restrain

the conduct complained of depends upon such broad interpretation of that Section as is now urged.

Accordingly, the order of the Board will be enforced except for paragraph 1(b) of part II thereof which is predicated upon Section 8(b)(1)(A) of the Act.