**NATIONAL LABOR RELATIONS BOARD, Petitioner,**

v.

**SAN ANGELO STANDARD, Inc.,**
Respondent.

No. 15511.

United States Court of Appeals
Fifth Circuit.

Dec. 30, 1955.

Marcel Mallet-Prevost, Asst. Gen. Counsel, N. L. R. B., Rosanna A. Blake, Atty., N. L. R. B., Washington, D. C., Theophil C. Kammholz, General Counsel, David P. Findling, Associate General Counsel, Samuel M. Singer, Attorneys, National Labor Relations Board, Washington, D. C., for petitioner.

John M. Scott, Fort Worth, Tex., Samuels, Brown, Herman & Scott, John E. Price, Fort Worth, Tex., for respondent.

Before HUTCHESON, Chief Judge, and HOLMES and RIVES, Circuit Judges.

HUTCHESON, Chief Judge.

The examiner found and concluded: that the respondent, in violation of the National Labor Relations Act, 29 U.S. C.A. § 151 et seq., had (1) discriminatorily refused employment to one Jesse James, and interrogated, threatened and interfered with its employees on account of union activities; and (2) refused to bargain with the representative of respondent's employees in the stereotyping and press departments. So finding he recommended to the board that the respondent be ordered to cease and desist therefrom and to take appropriate affirmative action.

The board, adopting these findings, conclusions and recommendations, entered its order [1] accordingly and is here seeking a decree enforcing it.

The respondent, while insisting that none of the findings are in accordance with the true facts, concedes that the record contains sufficient evidence to support the finding, that supervisors interrogated, interfered with and threatened some of the employees, and the order except as to Jesse James and the refusal to bargain. It thus reduces to two the questions presented for decision here.

The first of these is whether the record supports the finding that respondent refused to bargain in good faith. The second is whether it supports the finding that Jesse James was unlawfully refused employment.

■ The board in its decision correctly declares and in effect reaffirms in its brief: "It is true, as respondent contends, that the act does not require an employer to make concessions to a union's demands, nor does it prevent the employer from seeking to reserve to itself the right to handle certain terms and conditions of employment unilaterally".

The respondent, agreeing with this statement of principle,[2] challenges the decision and brief as giving it lip service only, as keeping the promise of the principle to the ear while it breaks it to the hope. In support of this position, through thirty-five pages of its brief, it details and analyzes the six bargaining meetings held and their results. It points, too, to the admitted fact that it was not the respondent but the union which, in the sixth meeting when the

1. Reported in 110 NLRB No. 181, the order directed respondent to: (1) cease and desist from (a) discouraging membership in the union by forbidden discrimination, (b) refusing to bargain with the certified union, (c) threatening its employees with reprisals, promising them rewards or interrogating them with respect to union activities, (d) in any other manner interfering with or coercing them; and (2) to take affirmative action (a) to offer James employment and make him whole, (b) * * * and (c) upon request to bargain with the union, and (d) * * *.

2. American Nat. Ins. Co. v. N. L. R. B., 5 Cir., 187 F.2d 307, affirmed 343 U.S. 395, 72 S.Ct. 824, 96 L.Ed. 1027.

contract had been agreed to in most of its points and the employer expressed its willingness to continue the negotiations to agreement, brought them to an end with the complaint that the employer had gotten the best of the bargaining and the contract which was about to be concluded would be of no value to the union.

We agree with respondent. Indeed, we think it plain that the examiner first and the board later, by finding and concluding that the respondent and not the union had refused to bargain in good faith, went counter both to the statute and the controlling decisions, and that on this record they could not have found other than that the union, because of dissatisfaction with the contract which had been almost, and was about to be, fully agreed upon, broke off the negotiations and, to borrow a word from the examiner, "adamantly" refused to continue the negotiations.

We think this naive statement in the examiner's report, though not made for that purpose or intended to have that effect, makes this completely clear:

> "The respondent's actions and its proposals *justified the union's claim made in the very conclusion of the session* that the respondent never intended to *sign a contract with the union unless it could use that contract 'to beat the employees over the head with it', and that the employees would be worse off with a contract than without one.*" (Emphasis supplied.)

In short, the examiner agreed with the union that, because it thought the respondent had gotten the best of the bargaining, it could be charged with and ought to be found guilty of not bargaining in good faith. Made from the same slanted viewpoint and proving the same thing is this statement in the board's brief:

> "The union finally asserted that it appeared that respondent did not intend to sign a contract *explaining that the union had given in on everything even to the extent of accepting provisions less desirable than existing practices, such as the one for sick leave. Instead, according to the union, the company was not only offering less than its present practice but was insisting on the right to reduce the benefits even more. As the union stated, 'the result of such a contract would be to put the men in much worse position than they were without a contract because the company could use it to beat the men over the head'.*" (Emphasis supplied.)

This being the case as to the breaking off of the negotiations, it is quite clear that examiner and board are taking the position which the board was accustomed to taking before the statute was enacted,[3] that if the employer did not agree to conditions and provisions which union and board thought they should agree to, and the union then, deciding not to take what had been agreed on, broke off the negotiations, the fault was with the employer and not with the union. It must be borne in mind, too, that the weakness of the case here against the position of board and examiner is accentuated by the fact that of the newspaper's 250 employees only 15 were in the unit and the stone which the union took as the stone of stumbling was a security contract, the benefits of which the company extended to all of its employees alike, and which, upon economic considerations for their protection and its own, it had reserved the right to change or

---

**3.** 29 U.S.C.A. § 158(d): "For the purposes of this section, to bargain collectively is the performance of the mutual obligation of the employer and the representative of the employees to meet at reasonable times and confer in good faith with respect to wages, hours, and other terms and conditions of employment, or the negotiation of an agreement, or any question arising thereunder, and the execution of a written contract incorporating any agreement reached if requested by either party, but such obligation does not compel either party to agree to a proposal or require the making of a concession * * *."

discontinue in any year. In short, demanding that the company change as to these fifteen employees a provision in the general security contract, which it had found necessary to insert and maintain, and being unable to obtain this concession, the union abandoned negotiations and quit the bargaining. How then did the board and the examiner arrive at their position? As the report of the examiner and the brief of the board show, they did it by starting with the premise that the company was opposed to having its plant unionized and had shown this opposition in its refusal to employ James and in the questions its supervisors had asked as to the union connections of their employees, and adding to this premise the fact that the manager had said early in the bargaining negotiations that no agreement would be reached because the company would not make a contract.

■ This will not do. For while these matters would, of course, be entitled to have due weight if the facts as to the bargaining were equivocal or ambiguous, they are of little or no weight here in the face of the undisputed facts as to bargaining. These, as collected and analyzed in thirty-five pages of respondent's brief, show that the parties did bargain through six sessions, that they did point by point and piece by piece agree on nearly every clause of the contract until they came to the security contract which offered the union exactly the same security the other employees

were getting, and that the union, having reached the conclusions that it had been outbargained and had not obtained a sufficiently satisfactory contract, decided to abandon the bargaining and did so.

Under these circumstances, to find that it was the company that refused to bargain and not the union is to go in the face of the evidence and the controlling law. Because, despite Scriptural and other injunction to look not upon the forbidden thing, memories are weak and wills are strong, we think it will serve a useful purpose to quote in the margin from the opinion of the Supreme Court in the American Nat. Ins. Co. case, 343 U.S. at pages 402 and 404, 72 S.Ct. at pages 828 and 829.[4]

The finding, that respondent violated its obligation to bargain with the union, being without support in the record, the order based thereon will not be enforced.

On the second point, the refusal to employ James, we think the shoe is on the other foot, and that here the respondent is seeking legalistically to avoid the effect of the evidence in this case, that it did take James' union connections into consideration in considering his application. It seeks to do this by insisting that the board failed to prove that an actual vacancy existed, and then, by argument procedure, upon over legalistic grounds, it seeks to darken counsel and pervert decision.

■■ It is true that there are two essentials to establishing an unfair la-

4. "The Act does not compel any agreement whatsoever between employees and employers. Nor does the Act regulate the substantive terms governing wages, hours and working conditions which are incorporated in an agreement. The theory of the Act is that the making of voluntary labor agreements is encouraged by protecting employees' rights to organize for collective bargaining and by imposing on labor and management the mutual obligation to bargain collectively.

     \*      \*      \*      \*      \*

"In 1947, the fear was expressed in Congress that the Board 'has gone very far, in the guise of determining whether or not employers had bargained in good faith, in setting itself up as the judge of what concessions an employer must make and of the proposals and counterproposals that he may or may not make.' Accordingly, the Hartley Bill, passed by the House, eliminated the good faith test and expressly provided that the duty to bargain collectively did not require submission of counter-proposals. As amended in the Senate and passed as the Taft-Hartley Act, the good faith test of bargaining was retained and written into Section 8(d) of the National Labor Relations Act. That Section contains the express provision that the obligation to bargain collectively does not compel either party to agree to a proposal or require the making of a concession."

bor practice charge of this kind, (1) that an application for employment be denied on the grounds of union membership or activity, and (2) that there was at the time of application an existing vacancy. It is, however, pushing this conjunction too far to say, under the facts in this case, that there was no vacancy, when of a certainty there was a temporary vacancy which was filled and there were consequent vacancies refilled by a continuous shuffling of men from outside of the unit into the positions made vacant in it.

While, therefore, we agree with the respondent that examiner and board have reached an indefensible conclusion that it was the respondent and not the union which failed and refused to bargain, we think it clear that on the second issue, it is the respondent's position that is indefensible.

Except, therefore, as to Paragraphs 1(b) and 2(c) the board's order will be enforced.