**NATIONAL LABOR RELATIONS BOARD, Petitioner,**

v.

**LOCAL 420, UNITED ASSOCIATION OF JOURNEYMEN AND APPRENTICES OF THE PLUMBING AND PIPEFITTING INDUSTRY OF THE UNITED STATES AND CANADA, AFL, John Small, Business Representative, A. J. Breene, Business Representative, and A. McHenry, Business Manager, Respondents.**

**No. 11863.**

United States Court of Appeals Third Circuit.

Argued Nov. 12, 1956.

Decided Dec. 11, 1956.

Rehearing Denied Jan. 10, 1957.

Elizabeth Weston, Washington, D. C. (Theophil C. Kammholz, Gen. Counsel, David P. Findling, Asso. Gen. Counsel, Marcel Mallet-Prevost, Asst. Gen. Counsel, Alice Andrews, National Labor Relations Board, Washington, D. C., on the brief), for petitioner.

Richard H. Markowitz, Philadelphia, Pa. (Wilderman & Markowitz, Louis H. Wilderman, Philadelphia, Pa., on the brief), for respondents.

Before GOODRICH, McLAUGHLIN and STALEY, Circuit Judges.

GOODRICH, Circuit Judge.

This case is before the court upon petition for enforcement by the National Labor Relations Board of an order against Local 420 and certain of its officers. The Board has found that Local 420 and the respondent officials violated Section 8(b) (2) and (1) (A) of the National Labor Relations Act as amended.[1] The two things which the Board found against the respondents were: (1) that they maintained an illegal closed shop agreement with J. J. White, Inc. and (2) that they caused the company to discriminate as to hire and tenure of employment against nonunion workmen, particularly the ten named in the charge.

The respondents do not seriously question that if the facts are as the Labor Board has found them unfair labor practices have been committed. N. L. R. B. v. F. H. McGraw & Co., 6 Cir., 1953, 206 F.2d 635. They deny that there is a reasonable basis for the conclusions which the Board has drawn. They also add a subsidiary objection to one phase of the proposed remedy. This will be discussed later.

We start with two propositions the recital of which has become established ritual in these cases. We view the record in its entirety. Universal Camera Corp. v. N. L. R. B., 1951, 340 U.S. 474, 71 S.Ct. 456, 95 L.Ed. 456. But it is not our task to resolve questions of credibility of those who testify at the Board hearings. N. L. R. B. v. Jarka Corp. of Philadelphia, 3 Cir., 1952, 198 F.2d 618; N. L. R. B. v. Local 369, International Hod Carriers' Union, A.F.L., 3 Cir., 1956, 240 F.2d 539.

### I.

Was There an Illegal Closed Shop Contract or Equivalent Practice at the Time of the Acts Complained Of?

It appears from the almost uncontradicted testimony that White employed, so far as the type of work done by the members of Local 420 is concerned, only members of 420, members of the same international union but some other

---

1. 49 Stat. 449 et seq. (1935) (as amended 61 Stat. 136 et seq. (1947) as amended 29 U.S.C.A. §§ 141 et seq. (1952) ). The petition for enforcement is pursuant to section 10(e), 29 U.S.C.A. § 160(e); the order was issued in proceedings under section 10(b), 29 U.S.C.A. § 160(b). The Board's decision and order are reported at 111 N.L.R.B. 1126 (1955).

local, or nonunion men with "permits" issued by Local 420 and paid for at $10.00 weekly by such nonunion workmen. How did this situation come about?

It appears that there is in the Philadelphia area an association of "air conditioning, heating and plumbing employers." J. J. White, Inc. is not a member of this association. But after an agreement has been reached between Local 420 and the employers' association White, Inc. and other employers not members of the association sign an identical contract for themselves. Now the contract which had been in force between White and Local 420 had a closed shop clause. Article VIII said in part:

"Section 1. It is agreed that the Signatory Contractor shall employ only U. A. Journeymen and Apprentices who are in good standing and who retain their good standing in Local Union No. 420."

This contract was to remain in force until April 30, 1953, and be automatically renewed from year to year thereafter unless either party gave notice of intent to terminate or change. The Union gave such notice through its Business Manager in a communication dated February 27, 1953. In April White, Inc. was told by the Union that "no Agreement had as yet been reached" with the association. And White, Inc. was requested to agree and did agree that the new agreement when negotiated and signed by Local 420 and the employers' association would be agreed to by White, Inc. effective as of May 1, 1953.

On July 25, the Union told White, Inc. that a new labor agreement had been consummated with the association. Certain paragraphs of this letter must be quoted for they are important in determining the answer to the first point made by the Union. The letter said:

"The terms of this New Labor Agreement set forth a wage rate of $3.40 per hour, plus 11½¢ per hour Health and Welfare Fund. The

effective date of the New Agreement will be *May 1st, 1953* and will expire *April 30, 1954*.

"There are a few other changes in this New Agreement which is now being prepared and which will be submitted to you in the near future.

"Your cooperation in putting this new wage rate into effect immediately will be greatly appreciated.
" *   *   * "

No further agreement was submitted to White, Inc. until a new association contract for the following year became effective May 1, 1954. No question of its legality has been raised. Our question is the status of the 1952-53 contract during the year 1953-54 in the light of (1) a formal notice to terminate; and (2) the letter of July 25 the contents of which have just been quoted.

The Board says that the 1952-53 contract, except for the wage provisions, governed the parties until it was superseded by the contract effective in April, 1954. We think that the Board's conclusion is justified. Company president, White, was never advised of any other changes except the matter of wages. Respondent McHenry said that "there was nothing, actually nothing actually agreed to * * * outside of wages and the amount of contributions." Did the witness mean that the employers' association and these individual employers had no other contract with the Union for 1953-54 but this wage and contribution scale? Such a conclusion seems almost frivolous when there has been a history of almost elaborate provisions in the labor contracts previously. The 1952-53 contract, for instance, has fourteen articles and covers thirteen printed pages and includes the usual terms of an inclusive contract of its nature. One cannot think that during the 1953-54 period this was all cast aside unless something new had been agreed upon between the parties. And we know that the only new part of the agreement was the wage and contribution scale.

Furthermore, there is testimony to support the conclusion that the 1952–53 contract continued except for the wage scale. White's president testified categorically that the 1952–53 contract "continued in effect" during 1953–54. Although he later withdrew the testimony, a Union official answered affirmatively the following question on cross-examination: "Now, isn't it a fact * * * that other than those agreements, as to the wages * * * all the terms and conditions of [the 1952–53 contract] continued in effect?" The same witness admitted that in another proceeding before the Board he had testified that another of the nonwage terms of the 1952–53 contract remained in effect during 1953–54 when such a conclusion was favorable to the Union.[2]

There is an alternative ground for support of the result which we have already indicated on the continuance of contract theory. The unfair labor practice can be found from a procedure which shows a practice or understanding though it may not establish an express contract between the parties. This appears in our own decision in N. L. R. B. v. Jarka Corp. of Philadelphia, 3 Cir., 1952, 198 F.2d 618, and is repeated by the court in N. L. R. B. v. Local 369, International Hod Carriers' Union, A.F.L., 3 Cir., 1956, 240 F.2d 387.[3] There is abundant testimony to show what the practice was and who directed it. Here are some, not all, of the pieces of evidence.

White's foreman, who did the hiring and who was himself a member of the Union, testified that "numerous times" at Union meetings he was instructed, "the only men that I could hire was Local 420 men." The following statements were attributed to various Union officials: "Don't lose these permits because if you lose this permit, you are out of business." "Do not lose these [permits]. You cannot work without these." "If you don't get permits, don't come back to work. Because I can't let you work without a permit." When one of the complainants was informed by the Union cashier that his permit would not be renewed, he said, "You mean we are out of work?" and she answered, "That's it." When the complainants began proceedings against the Union, an official of the Union charged White's foreman with trying to embarrass the Union stating, "Didn't you know that [the complainants] were to be all off the payrolls?" He later said to White's president, "They should have all been gotten rid of by the first of April." The complainants claimed unemployment compensation and stated that they were unemployed because they were denied permits by the Union. At a meeting with Union officials to discuss this matter White's president several times complained of being "in the middle" between the Union and the complainants. The whole conversation presupposes the Union's responsibility for the unemployment. The Union officials did not deny the truth of the incident concerning unemployment compensation forms. On the contrary one official suggested that White state that the men were discharged for lack of work. This he knew

2. The following references are relevant in this connection: United Association of Journeymen & Apprentices of the Plumbing Industry, AFL, 109 N.L.R.B. 854 (1954). That case involved a jurisdictional dispute with another union and the respondent Union claimed the advantage of a contract clause assigning the work to its members. A similar clause appeared in the May 1, 1954 contract. In further proceedings before this Court arising out of the same jurisdictional dispute, the Union claimed by clear implication that it was entitled to the disputed work by contract throughout an entire period which spanned the year 1953–54 during which year there was no written contract. Schauffler v. United Association of Journeymen & Apprentices of Plumbing & Pipe Fitting Industry, A. F. L., 3 Cir., 1956, 230 F.2d 572, 3 Cir., 1955, 218 F.2d 476.

3. The Court comments upon and explains N. L. R. B. v. Thomas Rigging Co., 9 Cir., 211 F.2d 153, certiorari denied 1954, 348 U.S. 871, 75 S.Ct. 107, 99 L.Ed. 685, and Del E. Webb Const. Co. v. N. L. R. B., 8 Cir., 1952, 196 F.2d 841.

to be untrue. When White refused, another official remarked, "Well, I guess we better issue them the permits." When asked on cross-examination to explain why White's foreman sent or took workmen to the Union hall for permits, a Union official replied, "To get the men down on that job," and, "Well, very obviously, he wanted men for the job."

The Union raises another point: the cause of the interruption of employment by complainants. After the men had worked for a time paying this permit money, they were refused a renewal of the permits at the end of one work week. They did not show up on the job the following Monday morning but went to the Union hall seeking permits instead. The Union's argument would have us believe that they quit voluntarily. The Board does not believe this and neither do we. It seems to us quite clear that the reason the men did not show up was because they knew that if they did they would not be allowed to work without a permit and they had been refused permits. Neither law nor common sense requires them to make a token appearance to preserve legal rights. N. L. R. B. v. Swinerton, 9 Cir., 1953, 202 F.2d 511.

## II.

### As to Remedy

Work permits to the complainants were, as described above, issued for $10.00 a week. One phase of the Board's order requires the Union to refund to the complainants the amount collected for these work permits.

The Union objects to this saying that this is "an ex post facto penalty for violation of Section 8(b) (5) of the Act" which was not charged. This argument is not well taken.

The Board's discretion in fashioning relief in a particular case is very broad. It is authorized to order "such affirmative action * * * as will effectuate the policies of this Act." Section 10(c), 29 U.S.C.A. § 160(c).

"The particular means by which the effects of unfair labor practices are to be expunged are matters 'for the Board not the courts to determine.' * * * [The remedy of the Board] should stand unless it can be shown that the order is a patent attempt to achieve ends other than those which can fairly be said to effectuate the policies of the Act." Virginia Electric & Power Co. v. N. L. R. B. 1943, 319 U.S. 533, 539, 540, 63 S.Ct. 1214, 1218, 87 L.Ed. 1568, rehearing denied 320 U.S. 809, 64 S.Ct. 27, 88 L.Ed. 489.

Reimbursement orders are proper to "remove the effects of [an] * * * unfair labor practice by restoring to the employees what would not have been taken from them," Id. 319 U.S. at page 544, 63 S.Ct. at page 1220, if the Act had not been contravened. Courts have enforced Board decrees ordering employers to reimburse employees for dues checked-off for a dominated or assisted union.[4] Unions have been ordered to repay excessive amounts coerced from employees in order to remain in good standing with the union;[5] dues and initiation fees paid by employees coerced into joining the union;[6] and pay lost because of a discharge caused by the union.[7] The order for refund was within the Board's authority.

The decision of the Board will be enforced.

---

4. Virginia Electric case, supra; N. L. R. B. v. Parker Bros. & Co., 5 Cir., 1954, 209 F.2d 278.

5. N. L. R. B. v. Eclipse Lumber Co., 9 Cir., 1952, 199 F.2d 684, 36 A.L.R.2d 625, enforcing, 95 N.L.R.B. 464 (1951).

6. N. L. R. B. v. Local 404, International Brotherhood of Teamsters, A. F. L., 1 Cir., 1953, 205 F.2d 99.

7. N. L. R. B. v. Local 57, International Union of Operating Engineers, 1 Cir., 1953, 201 F.2d 771.