**NATIONAL LABOR RELATIONS BOARD, Petitioner,**

v.

**LOCAL 369 INTERNATIONAL HOD CARRIERS' BUILDING AND COMMON LABORERS' UNION OF AMERICA, AFL, Respondent.**

**No. 11945.**

United States Court of Appeals Third Circuit.

Argued Oct. 5, 1956.

Decided Dec. 3, 1956.

Rehearing Denied Feb. 6, 1957.

---

540

Margaret M. Farmer, Washington, D. C. (Theophil C. Kammholz, Gen. Counsel, Marcel Mallet-Prevost, Asst. Gen. Counsel, Samuel M. Singer, Attys., National Labor Relations Board, Washington, D. C., on the brief), for petitioner.

Albert K. Plone, Camden, N. J., (Plone & Tomar, Camden, N. J., on the brief), for Local 369, International Hod

Carriers' Building and Common Laborers' Union of America, AFL, respondent.

Before McLAUGHLIN, KALODNER and STALEY, Circuit Judges.

KALODNER, Circuit Judge.

This is a petition of the National Labor Relations Board pursuant to Section 10(e) of the National Labor Relations Act, as amended, to enforce its order issued against the respondent in proceedings under Section 10(b) of the Act.[1]

The Board adopted the findings, conclusions and recommendations of the Trial Examiner and found that job applicant James Carr was denied employment with Frommeyer and Company[2] ("Company") by its superintendent as a result of an arrangement between the Company and respondent Local 369 International Hod Carriers' Building and Common Laborers' Union of America, AFL ("Union") which required the Union's approval as a condition of employment with the Company. The Board further found that the Union attempted to cause and did cause the Company to violate the Act and thus engaged in unfair labor practices within the meaning of Section 8(b) (2) and 8(b) (1) (A).[3]

The factual findings of the Board may be summarized as follows:

In mid-July, 1954, James Carr, a laborer, visited the Union's headquarters in Trenton, New Jersey, and asked for a "work slip" to permit him to work in the Trenton area. Frank Gonzales, the Union's secretary-treasurer, told Carr, who was not a union member, that he

had no work available. Carr then asked Gonzales if he would accept his initiation fee if he found a job. Gonzales replied that the initiation fee was $25.00, gave Carr his business card, and told Carr to call him if he found work.

After leaving the Union's office Carr, through one Alex Powers, a laborer leadman of the Company, heard there was a job opening at the Company's project at McGuire Air Base near Fort Dix, New Jersey. Subsequently he returned to the Union's headquarters and spoke to Michael Neylan, the Union's business agent, about joining the Union. Neylan advised him that he had "eighteen or nineteen men on the bench" waiting for work and that they "would have to be placed" before he would accept Carr's application for Union membership.[4]

Several days later Carr boarded a station wagon which was transporting workmen to the construction site. Enroute the driver picked up Charles Conway, the job superintendent, to whom Carr was introduced as a man Powers had sent. Carr asked Conway for a job and Conway asked Carr if he had a Union card. Carr said he did not have a card but showed Conway the business card that Gonzales had given him. Conway said it would be "all right with him if it is all right with [James] Peters" (the Union's job steward). When the station wagon reached the construction site, Conway told Carr to talk to Peters.

Carr asked Peters for a job. Peters asked Carr if he had a Union book. When Carr said that he did not have a book and showed Peters the card which

1. 49 Stat. 453, 454 (1935), as amended, 29 U.S.C.A. § 160(b, e). The Board's decision and order are reported at 114 N.L.R.B. 872 (1955).

2. The Company involved, A. C. Frommeyer, Charles M. Foley, and Jos. E. Murphy d/b/a Frommeyer & Co., a Pennsylvania partnership with its office and principal place of business in Philadelphia, Pa., is engaged as a bricklayer contractor in the construction business. During the year 1954, the Company performed bricklaying work in States other than the State of Pennsylvania which was valued in excess of $1,000,000. The Board's finding that the Company is engaged in commerce within the meaning of the Act is not contested.

3. 49 Stat. 452 (1935), as amended, 29 U.S.C.A. § 158(a) (3); 61 Stat. 141 (1947), 29 U.S.C.A. § 158(b) (2), (b) (1) (A).

4. The record does not disclose whether Carr at this time informed Neylan of the availability of a job with the Company.

Gonzales had given him, Peters pointed out that the card did not say "Okay for work".

Peters reported to Conway that "Carr didn't have a book" to which Conway replied "Okay".

After his interview with Peters, Carr told Conway what Peters had said to him. Conway thereupon told Carr that there was nothing he could do for him. However, when Carr asked Conway whether a job would be open for him if he "would go to the Local and get it straightened out at the Local", Conway replied that "he would take care of" him.

Carr then went to the Union's headquarters and told Neylan that he had found a job[5] and that he would like to join the Union. Neylan again told him that there were "eighteen or nineteen men on the bench" who "would have to be placed" before Carr could be admitted to the Union. Carr was again refused admission to the Union the following day and never returned to the construction site.

5. No specific reference was made to the Company job.

6. The Board required the Union to cease and desist from the unfair labor practices found, or from in any other manner restraining or coercing employees or applicants for employment in the exercise of their rights guaranteed by Section 7 of the Act. Affirmatively, the Union is required to notify the Company and James Carr in writing that it withdraws its objection to the employment of Carr and that it requests the Company to employ Carr unless the McGuire Air Base project has been completed; to make Carr whole for any loss of pay he may have suffered by reason of the discrimination practiced against him; and to post appropriate notices. Since no charge was filed against the Company, the Board's order runs only against the Union. Cf. Radio Officers' Union of Commercial Telegraphers Union, AFL v. National Labor Relations Board, 1954, 347 U.S. 17, 52–53, 74 S.Ct. 323, 98 L.Ed. 455.

7. "Sec. 8(a) It shall be an unfair labor practice for an employer—

On the basis of the foregoing facts and other testimony of witnesses, the Board, in agreement with the Trial Examiner, found that the Union had violated the Act.[6] The Board concluded that the Union had violated both Section 8(b)(2) and Section 8(b)(1)(A).[7] In National Labor Relations Board v. Jarka Corp., of Philadelphia, 3 Cir., 1952, 198 F.2d 618, we discussed these two sections and the significance of each. See also National Labor Relations Board v. Philadelphia Iron Works, 3 Cir., 1954, 211 F.2d 937. In the Board's opinion and in the presentation to this Court this case has been postured as involving an 8(b)(2) violation. While we agree that the Union has violated Section 8(b)(2) of the Act, we do not consider the applicability of Section 8(b)(1)(A) to this situation.

The Union urges that the Board's order should be reversed and contends that the following findings of the Board are not supported by substantial evidence: (1) the finding that there was an agreement or understanding, between the Company and the Union that the Company would only hire the Union's mem-

\* \* \* \* \*

"(3) by discrimination in regard to hire or tenure of employment or any term or condition of employment to encourage or discourage membership in any labor organization \* \* \*

\* \* \* \* \*

"(b) It shall be an unfair labor practice for a labor organization or its agents—

"(1) to restrain or coerce (A) employees in the exercise of the rights guaranteed in section 7 \* \* \*

"(2) to cause or attempt to cause an employer to discriminate against an employee in violation of subsection (a) (3) \* \* \*."

Section 7 provides:

"Employees shall have the right to self-organization, to form, join, or assist labor organizations to bargain collectively through representatives of their own choosing, and to engage in other concerted activities for the purpose of collective bargaining or other mutual aid or protection, and shall also have the right to refrain from any or all of such activities \* \* \*."

bers; (2) the finding that the Union caused the Company to discriminate against Carr; (3) the finding that Carr was denied employment by reason of his non-union status.

■ The Trial Examiner initially found that the Company was pursuing a general hiring practice of clearing laborers with the Union's steward which was unlawfully discriminatory within the meaning of Section 8(a) (3). There is substantial evidence to support such a finding. The Union, placing principal reliance upon National Labor Relations Board v. Thomas Rigging Co., 9 Cir., 211 F.2d 153, certiorari denied, 1954, 348 U.S. 871, 75 S.Ct. 107, 99 L.Ed. 685, urges that the existence of a discriminatory hiring agreement could not be inferred from the unilateral action of the Company. With this premise we agree, but the facts here disclose more than a unilateral discrimination. Cf. National Labor Relations Board v. Local 743 United Brotherhood of Carpenters & Joiners of America, 9 Cir., 1953, 202 F.2d 516. That the Union actively participated in the discriminatory hiring practice of the Company is manifest. The Union, through its job steward, Peters, questioned Carr about his Union status, reported to Conway, the Company superintendent, that Carr "didn't have a [union] book", and instructed Carr to secure one in order that he might "go to work". Furthermore, the testimony discloses that Neylan, the Union's business agent, upon his first visit to the construction project, instructed Peters that Conway "was supposed" to refer job applicants to him, and that he should check their union status before they started work and report to Conway whether they were "okay or not". Neylan described the duties of the steward to Conway in the presence of Peters, including the duty of checking the union books of "new men". Conway himself admitted that it was "customary" for him to refer new men to the Union's steward before placing them on the job and to receive the steward's report as to whether their employment would or would not be "satisfactory" to the Union.

■ After summarizing the testimony, the Trial Examiner further stated that "Conway's conduct in referring Carr, whom he was otherwise willing to employ, to Steward Peters for approval, coupled with his statement to Carr upon learning of Peters' disapproval that there was nothing he could do, is scarcely explainable except on the hypothesis that the Union and the Company had in some way agreed that in certain circumstances at least union approval was to be a condition of employment". The combination of circumstances here makes no other explanation reasonable. Conway's testimony to the contrary was found by the Trial Examiner to be self-contradictory, evasive and inherently improbable, and was discredited. The Board's judgment as to credibility will not be disturbed. National Labor Relations Board v. Jarka Corp. of Philadelphia, supra.

■ The Union further urges the fact that four non-union men had been employed by Conway in the course of the construction job. While proof of the hiring of non-union men is a significant factor for the Board to consider, alone it does not dispel the existence of a discriminatory hiring arrangement. National Labor Relations Board v. Philadelphia Iron Works, supra. The weight of the contrary evidence is not sufficiently detracted from to reverse the Board's inference. See Universal Camera Corp. v. National Labor Relations Board, 1951, 340 U.S. 474, 488, 71 S.Ct. 456, 95 L.Ed. 456.

In final support of its first contention, the Union urges the applicability of Del. E. Webb Const. Co. v. National Labor Relations Board, 8 Cir., 1952, 196 F.2d 841, 38 A.L.R.2d 402, to these facts. In the Webb case the General Counsel faced the difficult task of proving a discriminatory hiring practice without any evidence of a refusal to hire non-union men. The Eighth Circuit denied enforcement of the Board's order but reserved

the question as to what the result would have been if such evidence had been adduced. The discriminatory refusal to hire Carr takes this case out of the Webb rationale.

 Since there is substantial evidence to support the Board's finding of an illegal hiring arrangement between the Union and the Company, the Union's last two contentions pale into insignificance. The Union's contention that it did not *cause* the Company to discriminate in violation of Section 8(a) (3) is without merit. The existence of a discriminatory hiring arrangement actively participated in by the Union and without whose cooperation the arrangement would not have been feasible amounts to an "attempt to cause" the Company to violate Section 8(a) (3). Furthermore, the Union, through the activities of its steward, Peters, in securing the discriminatory refusal to hire Carr, "caused" the Company to discriminate within the meaning of Section 8(b) (2). The absence of proof that the Union specifically requested the Company to discriminate is not critical where there is substantial evidence to support the finding of a discriminatory hiring arrangement actively participated in by the Union.

 Finally, the Union contends that proof of discrimination against Carr was not shown in the absence of evidence to show the availability of a job. In order to establish a discrimination with regard to hire, the availability of a job at the time of application for which the applicant was qualified must be proved. See National Labor Relations Board v. San Angelo Standard, 5 Cir., 1955, 228 F.2d 504, 508. However, it is well settled that even though a job is not available, discrimination may be inferred where it is clear that the existence of a discriminatory hiring practice would make reapplication futile when a job opening does occur. National Labor Relations Board v. Anchor Rome Mills, 5 Cir., 1956, 228 F.2d 775; National Labor Relations Board v. Local 803, International Brotherhood of Boilermak-

ers, etc., AFL, 3 Cir., 1955, 218 F.2d 299. Carr could not have been more effectively informed of the futility of reapplying for a job. The Conway-Peters episode and the Carr attempts to gain membership in the Union clearly foreclosed for Carr the opportunity to work with the Company.

For the reasons stated, the order of the Board will be enforced except insofar as it relates to Section 8(b) (1) (A) of the Amended Act.

### Sur Petition for Rehearing.

Before BIGGS, Chief Judge, MARIS, GOODRICH, McLAUGHLIN, KALODNER and STALEY, Circuit Judges.

### PER CURIAM.

The National Labor Relations Board has petitioned for rehearing because of our denial of enforcement as to that part of the Board's order which related to Section 8(b) (1) (A) of the National Labor Relations Act, as amended. In so doing we said:

> "In the Board's opinion and in the presentation to this Court this case has been postured as involving an 8(b) (2) violation. While we agree that the Union has violated Section 8(b) (2) of the Act, we do not consider the applicability of Section 8(b) (1) (A) to this situation."

Our action was premised on the fact that the Board's findings only spelled out the existence of a discriminatory hiring agreement between the respondent Union and the employer which resulted in a denial of employment to one Carr, conduct proscribed by Section 8(b) (2). The Board was apparently of the view that, without more, that constituted the basis for the sweeping injunction of paragraph 1(c) of the order, which required the Union to cease and desist from:

> "In any like or other manner, restraining or coercing employees of, or applicants for employment with, the said Company in the exercise of their rights guaranteed in Section

7 of the Act, except to the extent that such rights may be affected by an agreement requiring membership in a labor organization as a condition of employment, as authorized by Section 8(a) (3) of the Act."

In National Labor Relations Board v. Express Publishing Company, 1941, 312 U.S. 426, 61 S.Ct. 693, 697, 85 L.Ed. 930, the permissive scope of a National Labor Relations Board order was considered by the Supreme Court. There the Board had found that the employer had committed an unfair labor practice under Section 8(a) (5) by refusing to bargain. In addition to ordering the employer to cease and desist from refusing to bargain, the Board, treating the employer's refusal to bargain as a violation of Section 8(a) (1), further ordered the employer to cease and desist from:

"In any manner interfering with, restraining, or coercing its employees in the exercise of their rights to self-organization, to form, join, or assist labor organizations, to bargain collectively through representatives of their own choosing, and to engage in concerted activities for the purposes of collective bargaining or other mutual aid and protection, as guaranteed in Section 7 of the Act."

Enforcement of the latter part of the order was denied by the Supreme Court.

The Express Publishing Company case sustains the conclusion reached in this case, and our reasons for such conclusion need not be set forth at great length. While the Union's conduct found by the Board to be an 8(b) (2) violation is also a "technical violation" of Section 8(b) (1) (A), there is no justification for an order restraining the Union from committing other acts unrelated to the one found. To the extent that future conduct of the Union falls within one of the prohibited areas of Section 8(b) the Board's proposed order may subject the Union to a contempt order if the conduct is also of the type prohibited by Section 8(b) (1) (A). In the Express Publishing Company case an order of this nature was denied enforcement where the resemblance between the unlawful act committed and other prospective violations was lacking. The violation here was not one involving general unlawful conduct and the order need go no further than to restrain the Union from causing or attempting to cause the Company to discriminate against an employee in violation of Section 8(a) (3) through the requirement of Union clearance or in any other manner causing or attempting to cause the prohibited result. "So far as respondent's past conduct may be thought to have had any effect on the rights guaranteed by § 7, such consequences would be effectively prevented by the prohibition of such an order without drawing it so broadly as to forbid all other unrelated unfair labor practices." National Labor Relations Board v. Express Publishing Company, supra, 312 U.S. at page 438, 61 S.Ct. at page 700; cf. National Labor Relations Board v. Jarka Corp. of Philadelphia, 3 Cir., 1952, 198 F.2d 618, 621.

For the reasons stated the petition for rehearing will be denied.