NATIONAL LABOR RELATIONS BOARD, Petitioner,

v.

LOCAL 1566, INTERNATIONAL LONGSHOREMEN'S ASSOCIATION, Respondent.

No. 12903.

United States Court of Appeals Third Circuit.

Argued Nov. 16, 1959.

Decided May 4, 1960.

884

Duane B. Beeson, Washington, D. C. (Stuart Rothman, Gen. Counsel, Thomas J. McDermott, Associate Gen. Counsel, Marcel Mallet-Prevost, Asst. Gen. Counsel, Russell Specter, Washington, D. C., Attorney, N. L. R. B., on the brief), for petitioner.

Abraham E. Freedman, Philadelphia, Pa. (Marvin I. Barish, Freedman, Landy & Lorry, Philadelphia, Pa., on the brief), for respondent.

Before BIGGS, Chief Judge, and GOODRICH and McLAUGHLIN, Circuit Judges.

McLAUGHLIN, Circuit Judge.

The National Labor Relations Board (Board) seeks enforcement of its order, pursuant to Section 10(e) of the National Labor Relations Act (Act), 29 U.S.C.A. § 151 et seq., against the respondent, Local 1566, International Longshoremen's Association (Union). The Board found that the Union violated Section 8(b) (2) and (1) (A) of the Act by causing an employer, Maritime Ship Cleaning and Maintenance Co. (Maritime) to discriminate against two applicants for employment, Marvin Gould and Zack Page, because of non-membership in the Union; by participating in a discriminatory hiring practice against non-member applicants; and by maintaining in effect, in the collective bargaining agreements of 1954 and 1957, unlawful union security clauses. The Trial Examiner held that the 1957 agreement only was unlawful for failure to comply with the filing requirements of Section 9(f), (g) and (h) of the Act, but the General Counsel contended and the Board found that both contracts were

unlawful apart from any considerations of filing.

The Board ordered the Union to cease and desist from entering into or enforcing any agreement or practice of preferential hiring except as authorized by Section 8(a) (3) of the Act; from causing, or attempting to cause Maritime to refuse employment to Gould and Page, or any other applicant, for non-membership in the Union in violation of Section 8(a) (3); and from restraining or coercing in any other manner employees or applicants for employment in the exercise of their rights under Section 7 of the Act, except to the extent authorized by Section 8(a) (3). The Board also ordered the following affirmative action: To make whole Gould and Page for any loss of pay resulting from the discrimination and to refund to the employees of Maritime the initiation fees, dues and all other monies unlawfully exacted from them as a price for their employment, for the period beginning six months prior to the filing and service of the charges (commonly referred to as the "Brown-Olds Rule").

Hiring at Maritime is effected by means of the "shape-up" system. Men desiring employment report each day at Maritime's place of business where hiring foremen, employees of Maritime and themselves union members, select from the group for whatever work is available on that day. The Trial Examiner determined and the evidence so establishes, that priority for employment was given according to union status. The applicants fell into three categories: (1) Book-men, who were full fledged members of the union and who, upon payment of dues, received an identification button, differently colored for each month. (2) Card-men, not members of the Union but who, upon payment of "dues" each month, were given a card. With twelve consecutive cards and compiling 700 work-hours on the waterfront, a cardman becomes eligible for full union membership. (3) Those applicants who had neither books nor cards. Priority was allocated according to these categories,

book-men receiving preference and upon exhausting these, card-men and finally, if any jobs remained, the last class.

Gould and Page were card-men, but in December 1956 the Union, through its Secretary-Treasurer, refused to issue their cards (along with some 7 to 10 other men) because they had not picketed during a strike which occurred about mid-November 1956. Subsequent to their bringing charges the parties were informed that the Union had rescinded its refusal to issue the cards. However, neither again sought them.

The Union resists enforcement of the Board's order on the grounds that any discriminatory hiring practices at Maritime were the unilateral action of Maritime's hiring foremen and there was insufficient evidence to support a finding that the Union participated therein; and the union security clause in the collective bargaining agreements was not unlawful since it was couched in terms of a "savings" or "deferral" clause. The Union also contests the Board's application of the "Brown-Olds Rule" in its remedy.

The Union does not question, and we shall not consider the finding that it was unauthorized to make a union security contract in 1957 for failure to comply with Section 9(f), (g) and (h) of the Act, nor the denial of its motion, at the hearing, for production of names and pre-hearing statements of witnesses.

 This court has reviewed the whole record and concludes there is substantial evidence to support the Board's findings. Such findings therefore are conclusive and will not be disturbed. Universal Camera Corp. v. National Labor Relations Board, 1951, 340 U.S. 474, 71 S.Ct. 456, 95 L.Ed. 456.

I.

Union Participation

The hiring system was based upon the union status of the men shaping-up—that is whether they had buttons, cards or neither—and it was the Union who determined that status and either is-

sued, or refused to issue, a button or a card. When some nine to twelve cardmen, including the complainants Page and Gould, did not walk a picket line the Union refused to issue them cards. This action might have been meaningless as a disciplinary measure if the Union had not been completely aware that without a card, employment opportunity was greatly reduced under Maritime's hiring practices. The constitution of the International provides that only the regular ILA button "shall be recognized in the hiring of men for work" and provides a penalty for violations. The constitution was supplemented on the local level by the collective bargaining agreements calling for hiring preference for Union members.[1]

The sum of this is a clear indication of a Union policy or practice of preferential hiring. The Trial Examiner held:

" * * * that where the circumstances disclose the establishment or imposition of a discriminatory hiring policy by or for a local union, that union may be held responsible where discrimination is a proximate and foreseeable consequence of the operation of the policy, and discrimination in fact results. This is not to impose upon the local responsibility for programs or conduct over which it has no control. It is merely to hold it accountable for its own action. If the local wishes to avoid liability in such situations there are effective methods by which it may disavow the offending policy."

■ At the hearing, the Union attempted to rebut this evidence with testimony that the hiring foremen were not aware of the clause in the International constitution. The Examiner did not credit this testimony since only one of the five foremen would so testify. Testimony that the local was orally advised by the International that the hiring clause in the constitution was not enforced and that locals, in any event, have blanket authority to ignore any provi-

sion in the constitution which they deem illegal was considered "incredible" by the Examiner in the teeth of evidence that other provisions are followed and enforced, particularly a specific method for dealing with the problem of illegal provisions. And the constitution itself declares null and void any local by-law in conflict with the constitution. The question of credibility of testimony is within the Trial Examiner's domain. " * * * it is not our task to resolve questions of credibility of those who testify at the Board hearings." National Labor Relations Board v. Local 420, etc., 3 Cir., 1956, 239 F.2d 327, 328.

■ The Union attempts to meet the Examiner's finding by averring that union participation in unfair practices must be proved by direct evidence. We are of the opinion that this is erroneous. It is true that many of the cases cited by the Board in support of its position contain indisputable evidence that the offending union formally requested or demanded that the company follow a discriminatory hiring practice. See e. g. National Labor Relations Board v. Local 369, etc., 3 Cir., 1956, 240 F.2d 539; National Labor Relations Board v. Local 420, etc., 3 Cir., 1956, 239 F.2d 327. But these decisions do not establish a minimum standard for finding union participation. In fact in National Labor Relations Board v. Local 369, supra, 240 F.2d at page 544, this court stated: "The absence of proof that the Union specifically requested the Company to discriminate is not critical where there is substantial evidence to support the finding of a discriminatory hiring arrangement actively participated in by the Union." The Board may, as it did here, draw a reasonable inference from the believable evidence. It must, of course, be supported by substantial evidence but an inference as such is not proscribed by the Act. This has been settled by Radio Officers' Union, etc. v. National Labor Relations Board, 1954, 347 U.S. 17, 48–52, 74 S.Ct. 323, 98 L.Ed. 455. There,

---

1. The "deferral" clause of these agreements is discussed infra.

union participation was proved but the unfair practice, encouragement of union membership, was inferred by the Board. The Court, in upholding the Board said at page 52 of 347 U.S., at page 342 of 74 S.Ct.:

"Since encouragement of union membership is obviously a natural and foreseeable consequence of any employer discrimination at the request of a union, those employers must be presumed to have intended such encouragement. It follows that it was eminently reasonable for the Board to infer encouragement of union membership * * *."

■ Conversely, the unfair practice being proved, the Board may make a reasonable inference from all the evidence that the Union participated in such practice. "The unfair labor practice can be found from a procedure which shows a practice or understanding though it may not establish an express contract between the parties." National Labor Relations Board v. Local 420, supra, 239 F.2d at page 330.

The Union's contention that direct evidence, rather than inference, is necessary to implicate it in the unfair practices is set at rest by the following language in Radio Officers' Union, supra, 347 U.S. at page 50, 74 S.Ct. at page 341:

"There is nothing in the language of the amendment [Taft-Hartley] itself that suggests denial to the Board of power to draw reasonable inferences. It is inconceivable that the authors of the reports [House Reports on Taft-Hartley] intended such a result for a fact-finding body must have some power to decide which inferences to draw and which to reject. We therefore conclude that insofar as the power to draw reasonable inferences is concerned, Taft-Hartley did not alter prior law."

The testimony in this instance is sufficient to support the resulting inference of the Board. Whether this court would have arrived at the same result is of no matter. Our review is limited to the sufficiency of the supporting evidence. Universal Camera Corp. v. National Labor Relations Board, supra, 340 U.S. 488, 71 S.Ct. 464.

## II.

### Union Security Clause

We turn now to the legality of the union security clause contained in the collective bargaining agreements between the Union and Maritime. It reads:

"Union Security: As to any and all work covered hereunder, finally determined by duly constituted public authority, not to be subject to any statute forbidding a preferential hiring provision, the employers agree to give preference to men who are members of the Union in good standing. As to all other work, the employers agree to institute and maintain a union shop as shall comply with Section 8(a) (3) of the National Labor Relations Act or any amendment thereto."

The Board found that this clause, in both the 1954 and 1957 agreements, was illegal despite the deferral language therein. This decision was based on the finding that, since the parties immediately began implementing the preferential portion without regard to the deferral language, the clause was executed with the present intent to create discriminatory conditions of employment.

The Union counters that a collective bargaining agreement *valid on its face* cannot be converted into an illegal hiring clause because of *subsequent* discriminatory practices. This argument can be dismissed as not meeting the issue. The Board found that the agreement was *not valid in fact, from its very inception.* It cannot be seriously argued that the mere recitation of words in a proper and accepted form can throw a blanket absolution over illegal acts presently performed under a clause, included in a contract, purportedly to cover a future possibility of legal sanction.

Finding as we do, it is unnecessary to discuss the issue whether the clause meets the requirement of "clear and unequivocal" set forth in Lewis v. Quality Coal Corp., 7 Cir., 1959, 270 F.2d 140, 143. However in passing, it should be pointed out that the clause involved, in both meaning and clarity, is a far cry from the one discussed in the Lewis opinion.

### III.

#### The Remedy

 The sole remaining problem is the Board's application of the "Brown-Olds Rule". In a recent decision, National Labor Relations Board v. American Dredging Company, 3 Cir., 1960, 276 F.2d 286, this court declined to enforce the rule against an employer who neither dominated the union nor collected the fees and dues. Further, there was no evidence in the record indicating that employees were required to join the union as a condition to obtaining employment. Requiring the employer in that situation to reimburse fees and dues paid to their union would be a windfall for the employees, and in no way effectuate the purposes of the Act. In National Labor Relations Board v. United States Steel Co. (American Bridge Division) and Local Union 542, AFL-CIO. 3 Cir., 1960, 278 F.2d 896, we have continued to insist that the reimbursement order must be limited to employees shown to have been coerced. And we emphasize that in such alleged instances it is necessary to produce evidence of coercion as to each individual concerning whom it is asserted. Since the record before us furnishes no proof of that type we are forced to refuse the part of the Board's order allowing reimbursement to employees for fees and dues they had paid. Regarding Marvin Gould and Zack Page, they are to be made whole for any loss of pay incurred by them as a result of the discrimination against them above stated.

The Board's order will be enforced except as to Paragraph 2(a) thereof which will be stricken.

The notice called for by Paragraph (c) of the Order will be amended by striking out its last paragraph. A decree in accordance with this opinion may be submitted.