**NATIONAL LABOR RELATIONS BOARD v. CENTURY CEMENT MFG. CO., Inc.**

No. 6, Docket 22652.

United States Court of Appeals,
Second Circuit.

Argued Oct. 6, 1953.

Decided Nov. 4, 1953.

George J. Bott, Gen. Counsel, David P. Findling, Associate Gen. Counsel, A. Norman Somers, Asst. Gen. Counsel, Arnold Ordman, Washington, D. C., and Dean E. Denlinger, Dayton, Ohio, for petitioner.

Lloyd R. LeFever, Kingston, N. Y., Kaye, Sholer, Fierman & Hays and William E. Grady, Jr., New York City, of counsel, for respondent.

Before CHASE, Chief Judge, and CLARK and FRANK, Circuit Judges.

CHASE, Chief Judge.

The respondent, a corporation engaged in manufacturing natural cement at its plant in Rosendale, N. Y., was found by the National Labor Relations Board to have there violated § 8(a) (1) (3) and (5) of the Taft-Hartley Act, 29 U.S.C.A. § 158(a) (1, 3, 5), and ordered both to cease and desist and to reinstate and make whole a discharged employee, Adams, for any loss of pay he may have suffered and to post the usual notices. This petition to enforce the order is contested on the ground that the evidence does not sustain the findings.

In the early Fall of 1950, Local 129 of the United Cement, Lime and Gypsum Workers International Union, A. F. of L. began to organize the respondent's employees and in a month or so claimed to represent a majority of them. The respondent, when so informed, did not concede that and a consent election, which the union won, was held on November 13th in that year. Then the Board certified it as the collective bargaining agent of the employees and a representative of the union and one of the respondent met for bargaining purposes on four occasions in January, March and April, 1951, pursuant to the request of the union but failed to agree upon the terms of a collective bargaining contract. Thereafter the union filed the charges which have resulted in the order of the Board.

The evidence adequately supports the findings to the effect that during these meetings there was discussion of a proposed agreement presented by the union at the first meeting concerning what may be broadly characterized as the usual subject matter of such agreements including hours of work, wages, bonuses, seniority, safety and welfare, grievances, arbitration and a union shop. The representative of the respondent reported the demands of the union to a Mr. Snyder who owned most of the stock of the respondent and was its active manager in control of its affairs. Following Snyder's instructions, the respondent's representative at the third meeting held on March 27, refused to agree to most of the union's proposals including such subjects as seniority, and promotions based on that, pay for overtime, holidays and paid vacations. He refused to bargain at all as to bonuses because they were a gratuity which Mr. Snyder took pride in granting as a personal matter as a prerogative of management. As the proposed grievance proce-

dure was to end in arbitration, it was rejected because arbitration was "obnoxious" to Mr. Snyder. The respondent made no proposals of its own as a basis for negotiation on such subjects. They were all, however, proper subjects for collective bargaining and while the respondent was, indeed, free to reject the union's demands in the exercise of its business judgment the failure to do little more than reject them was indicative of a failure to comply with its statutory requirement to bargain in good faith. Moreover, when the negotiations with the union had about reached the stage where the union's demands as to wages were to be the principal subject for discussion for the time being, the respondent without consultation with the union announced to its employees by means of notices posted on its bulletin board that it was planning to put into effect a merit system based on initiative, interest and co-operation and that a stated wage increase would become effective April 1, 1951, which would be in addition to the previously announced merit system remuneration. Such unilateral action as to subject matter proper for bargaining negotiations was further evidence of a failure to bargain in good faith in violation of § 8(a) (5) and (1) of the Act. N. L. R. B. v. Crompton-Highland Mills, Inc., 337 U.S. 217, 69 S.Ct. 960, 93 L.Ed. 1320; N. L. R. B. v. Niles-Bement-Pond Co., 2 Cir., 199 F.2d 713; N. L. R. B. v. Jacobs Mfg. Co., 2 Cir., 196 F.2d 680; N. L. R. B. v. Israel Putnam Mills, Inc., 2 Cir., 197 F.2d 116; N. L. R. B. v. Acme Air Appliance Co., 2 Cir., 117 F.2d 417.

■ However, we do not think a fair estimate of the evidence in the record considered as a whole fairly supports the finding that the discharge of Adams on December 17, 1950, was due to discrimination in violation of § 8(a) (3). He sympathized with the union and made no bones of giving the respondent to understand that, but his efforts to bring about the organization of the plant were negligible and so was his union activity thereafter. Though he was present at two of the bargaining conferences the Board

did recognize that his discharge previous to his appearance at either conference could not be attributed to discriminatory retaliation because of that. He was a man addicted to periodic drinking to excess which had often caused his failure to report for work on Saturdays though until his discharge in this instance the respondent had refrained from taking such action. But at this time he was working as one of five men in the packing crew who were all laid off because of lack of work as were others in the plant. The "usual winter layoff" was due to lack of shipping orders at that time of year. He made no objection at the time but as he testified "just took it for granted."

■ Nor was the Board's finding that the respondent discriminatorily refused to reinstate Adams when in March, for the first time, he spoke to Plant Superintendent Fahey, adequately supported by the evidence. Then according to his own testimony he didn't "go on the job or look for the job" but "was going to Fahey's house, so I stopped and spoke to him." Fahey replied, "I didn't know you were not working up there. I was busy at the lime plant. If you want the job back why don't you go up and see the Old Man (Snyder)?" Adams further testified that he didn't go to see Snyder or do anything further about reinstatement. On March 27, 1951, however, the union did request the reinstatement of Adams. He was refused reinstatement, according to the respondent's evidence, because of his record of excessive drinking and absenteeism. That was good reason for refusing to reinstate him, his drinking and absenteeism was well established and the inference that the refusal to reinstate was unlawfully discriminatory in the light of such evidence to the contrary was quite unjustified. N. L. R. B. v. U. S. Gypsum Co., 5 Cir., 206 F.2d 410; N. L. R. B. v. Stafford, 8 Cir., 206 F.2d 19; Rubin Bros. Footwear, Inc. v. N. L. R. B., 5 Cir., 203 F.2d 486.

The order is modified to deny reinstatement to Adams and as so modified is enforced.