R. L. WHITE, John H. White, Joella White Bitter and Evelyn White Thomson, d/b/a White's Uvalde Mines,

v.

NATIONAL LABOR RELATIONS BOARD.

No. 16662.

United States Court of Appeals
Fifth Circuit.
April 23, 1958.
Rehearing Denied May 29, 1958.

Theo. F. Weiss, San Antonio, Tex., Clemens, Knight, Weiss & Spencer, San Antonio, of counsel, for petitioners.

Stephen Leonard, Associate Gen. Counsel, NLRB, Frederick U. Reel, Atty., Washington, D. C., Jerome D. Fenton, Gen. Counsel, Marcel Mallet-Prevost, Asst. Gen. Counsel, Robert J. Wilson, Atty., National Labor Relations Board, Washington, D. C., for respondent.

Before RIVES, TUTTLE and CAMERON, Circuit Judges.

TUTTLE, Circuit Judge.

This is a petition by the individual petitioners, doing business as White's Uvalde Mines, to review and set aside an order of the National Labor Relations Board, and a cross-request by the Board that the order be enforced.

Although the petitioners seek also to have set aside orders of the Board finding they had violated Section 8(a) (1) of the Act by making threats and promises to their employees and that they violated Section 8(a) (5) and (1) of the Act by instituting minor wage increases without prior negotiations with the employee's bargaining representative, the principal issue is whether there was substantial evidence on the record as a whole to support the Board's finding that petitioners failed to bargain in good faith and that the strike which occurred was therefore an unfair labor practice strike.

Without outlining the evidence as to the 8(a) (1) violations, we find that there was evidence which supported the finding of the Board that there was conduct on behalf of the company which interfered with, restrained and coerced employees in the exercise of their right to engage in union and concerted activities, and that petitioners thus violated Section 8(a) (1) of the Act. We think, however, the unilateral increase of pay of five of the sixty members of the bargaining unit, each of which was accounted for as being appropriate to the particular individual in relation to his job, and all of which occurred before the bargaining sessions commenced did not amount to violations of either Section 8(a) (1) or 8(a) (5) of the Act. These were not such general increases as were criticized in N. L. R. B. v. Crompton-Highland Mills, 337 U.S. 217, 69 S.Ct. 960, 93 L.Ed. 1320 and May Department Stores Co. v. N. L. R. B., 326 U.S. 376, 66 S.Ct. 203, 90 L.Ed. 145, or in Armstrong Cork Co. v. N. L. R. B., 5 Cir., 211 F.2d 843. In the subsequent bargaining sessions petitioners were willing at all times to bargain with respect to wages and classifications, but they adhered to their insistence on the inclusion in any contract of their right to make merit increases. These particular increases were simply in line with their custom and practice and could not be said to be either restraint or coercion under 8(a) (1) or a refusal to bargain in good faith under 8(a) (5).

Coming to the remaining issue, we find that we are at last required to determine whether, in an otherwise unassailable attitude of collective bargaining, the employer may nevertheless be found guilty of a failure to bargain in good faith solely upon a consideration of the content of the proposals and counter proposals of the parties. In other words may the charge of refusal to bargain in good faith be sustained solely by reference to the terms of the employment contract which management finally says it is willing to sign if such proposed contract could fairly be found to be one

which would leave the employees in no better state than they were without it. For the purpose of considering this question we may assume that the Board could find that the terms of the contract insisted on by the company requiring the surrender by the employees of their right to strike and their agreeing to leave to management the right to hire and fire and fix wages in return for agreements by the company respecting grievances and security that gave the union little, if any, real voice in these important aspects of employment relations would in fact have left the union in no better position than if it had no contract. It is perfectly apparent that the company representatives approached the bargaining table with a full understanding of their obligations to meet with, and discuss with, representatives of the employees any terms and conditions of employment that either party put forward; that they must at least expose themselves to such argument and persuasion as could be put forward, and that they must try to seek an area of agreement at least as to some of the terms of employment; that if they were able to arrive at such agreement they must be willing to reduce it to writing and sign it. It is of some significance that at the fourth of the six bargaining sessions, when challenged by the employees' bargaining agent [1] the company's managing partner signed the company's proposed complete contract and tendered it to the union, which declined to accept it. The question is: Can the company's insistence on terms overall favorable to it in net result be taken as proof that it did not approach the bargaining table in good faith, but that it approached the bargaining table only to give the outward sign of compliance when it had already excluded the possibility of agreement?

We think it quite significant that neither the Board itself nor the general counsel places any reliance on the 8(a)(1) violations, other than the unilateral wage increases, as affording any evidence of absence of good faith bargaining. The trial examiner did comment in his findings on the testimony of an employee to the effect that a company foreman, Evetts, attempted to secure his aid to destroy the Union.[2] The Board adopted the findings, recommendations and conclusions of the examiner, but neither in the Board's opinion nor in the General Counsel's brief is this matter mentioned. Having eliminated the wage increases as 8(a)(5) violations we find that there is therefore nothing to support the Board's finding of a failure to bargain in good faith aside from the proposals and counter proposals of the parties and their attitudes as reflected at the bargaining table.

1. Burton, the union representative, said: "I told him personally I didn't believe they would sign their own contract. He called my bluff and had John White sign it."

2. The finding of the examiner follows:
"Certain coercive acts attributable to the Company occurred during the period when meetings between the Company and the bargaining agent of its employees were taking place. They would have no bearing on the question of the Company's good faith in its bargaining if, in fact, the Company had not authorized them and had no knowledge of them. It will be recalled, however, that Lopez testified that a few days before the strike started, Evetts attempted to solicit his aid to 'destroy the Union' telling Lopez that he (Evetts) was 'authorized by Mr. Johnny White to do this.' It will also be recalled that White testified that when Evetts had been made a foreman he had been instructed against any such conduct and that union matters were to be handled solely by White. He also testified that he never 'received any evidence Mr. Evetts violated those instructions.'
"Evetts did not testify and nowhere in White's testimony is there any denial of Lopez' testimony. There is nothing to indicate that at the time Evetts talked to Lopez he was not doing so under specific instructions from White as claimed by Evetts. Accordingly, I find that Evetts' statement constitutes an admission that at the time Respondent was meeting with the Union it was also seeking to destroy it.[42]
" [42] Cf. Drico Industrial Corporation, 115 N.L.R.B. No. 142."

We start with the statute[2a] which states specifically that the "obligation [to bargain collectively] does not compel either party to agree to a proposal or require the making of a concession." The Board, in its brief, recognizes this but fails to give effect to it in stating its contention. Cf. N.L.R.B. v. San Angelo Standard, 5 Cir., 228 F.2d 504. Immediately after outlining nine different points of difference between the parties,[3] the brief says:

**2a.** "(d) For the purposes of this section, to bargain collectively is the performance of the mutual obligation of the employer and the representative of the employees to meet at reasonable times and confer in good faith with respect to wages, hours, and other terms and conditions of employment, or the negotiation of an agreement, or any question arising thereunder, and the execution of a written contract incorporating any agreement reached if requested by either party, but such obligation does not compel either party to agree to a proposal or require the making of a concession: * * *." 29 U.S.C.A. § 158(d).

**3.** It would extend this opinion too greatly to outline in detail the proposals and counter proposals and the responses of the parties to them at the seven different bargaining sessions. However, it would seem that the statement of the criticized actions of the company, as enumerated by counsel for the Board in its brief, is as strong a presentation of the Board's views as is available. With some comments added by the Court, the brief says:

"A fair summary of the Company's bargaining in this case reveals the following:

"1. The Company, while insisting on a 'no strike' clause with provisions for union liability in the case of breach, at first resisted a corresponding 'no lockout' clause, and after agreeing to such a clause refused at all times to agree to a provision calling for corresponding liability in the event of its breach.

"2. As the courts have recognized, a union's contractual waiver of its statutory right to strike is normally accompanied by a provision that disputes between the parties will be settled by grievance procedures and arbitration rather than by such 'self-help' measures as strikes. But the Company in this case coupled its insistence on a no-strike clause with an insistence that matters going to arbitration must be decided in the Company's favor if there was any evidence that the Company's position was not arbitrary or capricious. Such limited arbitration would leave the Union 'hamstrung' in a dispute with the Company, unable to strike or to secure a review on the merits by the arbitrators.

"3. The Company at no time acceded to any proposal for the selection of a neutral arbitrator, in the event the arbitrators chosen by the Union and the Company could not agree. [The company proposal was that the two arbitrators select the third.]

"4. In the absence of any contract, the Company could not lawfully change its wage rates or grant merit increases or alter shop rules relating to working conditions without first bargaining with the Union over those changes. But the Company insisted, as a condition of the contract, that the Union surrender its right to bargain about those matters, and leave the Company free to act in a manner which, but for the contract, would be violative of the law.

"5. Although the Company professed to find the matters of house rentals and physical examinations 'of no importance', it insisted that the contract contain no provision as to the Union's right to bargain over the rental rates of Company houses, and further insisted that the contract require the employees to submit to a physical examination by the Company doctor, whose word as to employment would be final. The Company's intransigent attitude over matters which it regarded as unimportant is itself suggestive of a want of good faith. [The company insisted that these matters were important to it, but not to the employees, because in neither respect had there been any complaint as to the company's attitude.]

"6. The Company rejected the Union's request that the contract provide for bargaining over the annual bonus, although in the absence of a contract such bonuses are matters over which bargaining is required. N.L.R.B. v. Niles-Bement-Pond Co., 2 Cir., 199 F.2d 713.

"7. Admitting that its minimum wage rate was substantially lower than comparable rates in the area, the Company at first 'stood pat' on wages, and eventually offered an increase to less than that embodied in the amendment to the federal wage and hour law, then being debated in Congress. [The statement that the Company admitted its minimum rate was substantially lower than comparable rates is strongly contested by the Company. The proposed increase

"We do not contend that any one of the foregoing specifications * * *[4] would standing alone constitute a refusal to bargain. We do urge, however, that on the record as a whole,[5] and in accord with such authorities as Majure v. N.L.R.B., 5 Cir., 198 F.2d 735; N.L.R.B. v. Denton, 5 Cir., 217 F.2d 567, 570, certiorari denied 348 U.S. 981 [75 S.Ct. 572, 99 L.Ed. 764]; N.L.R.B. v. Reed & Prince Mfg. Co., 1 Cir., 205 F.2d 131, certiorari denied 346 U.S. 887 [74 S.Ct. 139, 98 L.Ed. 391], and N.L.R.B. v. Century Cement Mfg. Co., 2 Cir., 208 F.2d 84, the Board could reasonably find that the Company had not approached the bargaining in the good faith spirit required by the Act."

Thus the Board is saying that although the statute says no concession need be made and no item need be agreed upon, if a company fails to concede *anything* substantial,[6] then this is too much, and such failure amounts to bad faith.

The language of the Courts is not, as it cannot be, in construing this difficult statute, entirely clear, but we find no case which precisely supports the proposition here asserted by the Board. The principal basis of the Board's attack here is the broad management function clause and the failure to agree to a real arbitration clause in which the arbitrators have final powers. The remaining provisions criticized by the Board could not conceivably be considered as proof of bad faith by the petitioners. As to the inclusion of a broad management functions clause and thus a refusal to permit matters relating to hiring, discharging, hours and working conditions to be subject to grievance procedures and arbitration, the Supreme Court has said:

"Congress provided expressly that the Board should not pass upon the desirability of the substantial terms of labor agreements. Whether a contract should contain a clause fixing standards for such matters as work scheduling or should provide for more flexible treatment of such matters is an issue for determination across the bargaining table, not by the Board. If the latter approach is agreed upon, the extent of union and management participation in the administration of such matters is itself a condition of employment to be settled by bargaining.

"Accordingly, we reject the Board's holding that bargaining for the management functions clause proposed by respondent was, per se, an unfair labor practice." National Labor Relations Board v. American National Insurance Co., 343

---

was a minimum of 90 cents per hour, which was the minimum actually enacted months later].

"8. Notwithstanding substantial concessions by the Union in the course of the negotiations, the Company characterized the Union's second proposal as 'about the same' as its first one, and the Union's third proposal as 'not substantially different'. Such a denial of the realities of the Union's efforts to compromise differences hardly comports with a good faith desire to bargain.

"9. Granting little beyond such bare requirements as a provision against discrimination, the Company took the attitude, expressed by its chief negotiator, that 'we are giving the contract, and that is something.' This attitude, we submit falls far short of what this Court has described as 'a duty * * * to enter into discussion with an open and fair mind, and a sincere purpose to find a basis of agreement touching wages and hours and conditions of employment, and if found to embody it in a contract as specific as possible * * *' Globe Cotton Mills v. N.L.R.B. [5 Cir.], 103 F.2d 91, 94."

4. The omitted part is a parenthetical reference to a tenth item that occurred after the strike had collapsed and is not germane to this discussion.

5. We assume by this is meant "all nine of them together with the unilateral increase of wages" heretofore eliminated by us.

6. Although it is here assumed that no net substantial concessions were made, the company vigorously asserts it made some of substance during the negotiations.

U.S. 395,[7] 72 S.Ct. 824, 832, 96 L.Ed. 1027.

If such a clause is not per se proof of failure to bargain in good faith then *a fortiori* insistence on physical examination by the company's own doctor, refusal to include terms of a Christmas bonus, a refusal to grant specified wage increases, refusal to "freeze" rent and utility charges on company-owned houses and like issues could not either separately or collectively constitute such proof.

In Majure v. National Labor Relations Board, 5 Cir., 198 F.2d 735, 737, in addition to insisting during the entire negotiations on an agreement wholly "favorable to its position," which we may assume occurred in the case before us, the employer there specifically refused to consider during the negotiations requests for increased compensation and paid vacations, whereas within a month after the negotiations broke down following a bargaining session at which the company contended "there was no place for a contract at Majure" because the men worked on commission and had "no right to be in the union," the company voluntarily granted a raise from 18% to 20% commission and granted paid vacations. This Court held that although it was not easy in that case to draw the dividing line, "we place our acceptance of the Board's order upon a consideration of the entire circumstances of the case," including what we have above outlined.

In N.L.R.B. v. Denton, 5 Cir., 217 F.2d 567, 570, also decided by this Court, we considered as part of the record which we found supported a finding of failure to bargain in good faith repeated statements by the employer and his supervisors that Denton "would never sign a contract with any union." This was coupled with the affirmed finding of discriminatory discharge of several employees to support a finding by the Board that the resulting strike was an unfair labor strike.

In addition to these Fifth Circuit cases the Board cites, in support of its position, N.L.R.B. v. Reed & Prince Mfg. Co., 1 Cir., 205 F.2d 131, certiorari denied 346 U.S. 887, 74 S.Ct. 139, 98 L.Ed. 391, and N.L.R.B. v. Century Cement Mfg. Co, 2 Cir., 208 F.2d 84. In both of these cases it is apparent that there were additional facts in the record which, when coupled with the absence of any concessions by the employer, warranted the Board, in the opinion of the respective Courts of Appeals to find failure to bargain in good faith.

■ We do not hold that under no possible circumstances can the mere content of the various proposals and counter proposals of management and union be sufficient evidence of a want of good faith to justify a holding to that effect. We can conceive of one party to such bargaining procedure suggesting proposals of such a nature or type or couched in such objectionable language that they would be calculated to disrupt any serious negotiations. A careful study of the record before us, and viewed with all the adverse emphasis the Board has placed upon the challenged actions of the company in its brief, footnote 3 supra, leaves us with the clear impression that the Board erred in finding adequate proof of a failure to bargain in good faith.

**7.** The terms of the management functions clause there before the Court was:

"The right to select and hire, to promote to a better position, to discharge, demote or discipline for cause, and to maintain discipline and efficiency of employees and to determine the schedules of work is recognized by both union and company as the proper responsibility and prerogative of management to be held and exercised by the company, and while it is agreed that an employee feeling himself to have been aggrieved by any decision of the company in respect to such matters, or the union in his behalf, shall have the right to have such decision reviewed by top management officials of the company under the grievance machinery hereinafter set forth, it is further agreed that the final decision of the company made by such top management officials shall not be further reviewable by arbitration."

The petition will be granted to the extent that the findings and order of the Board relate to a Section 8(a) (5) violation and to a refusal to bargain in good faith, and to the determination that the strike was an unfair labor practice strike. It is denied so far as it relates to the finding and order of the Board as to the Section 8(a) (1) violation based on the findings other than as to the minor wage increase.

RIVES, Circuit Judge.

I respectfully dissent. The nature of the 8(a) (1) violations, which we all agree are supported by substantial evidence on the record as a whole, seems to me to have a bearing upon the other claimed violations. They were accurately described in the Board's brief, as quoted in the margin.[1] From those violations, along with the other evidence, both positive and negative, the Trial Examiner arrived at a carefully reasoned finding, "that at the time Respondent was meeting with the Union it was also seeking to destroy it." (See Footnote 2 to the majority opinion.) The Board adopted that finding.

The Union won a Board-conducted representation election 50 votes to 10. On October 8, 1954, the Union was certified as the bargaining representative of the employees. Within a month, without any attempt at bargaining, or even notice to the Union, the Company raised the wages of five employees. I do not agree that only "general increases" were criticized in N.L.R.B. v. Crompton-Highland Mills, 337 U.S. 217, 69 S.Ct. 960, 93 L.Ed. 1320; May Department Stores Co. v. N.L.R.B., 326 U.S. 376, 66 S.Ct. 203, 90 L.Ed. 145; Armstrong Cork Co. v. N.L.R.B., 5 Cir., 211 F.2d 843. Granting merit increases to five out of sixty employees, without consulting the Union, constituted, I think, unilateral action which naturally tended to undermine the authority of the certified bargaining representative for each and all of the employees, and violated Sections 8(a) (5) and (1) of the Act.

Section 10(f) of the Act, 29 U.S.C.A. § 160(f), provides in part that: " * * * the findings of the Board with respect to questions of fact if supported by substantial evidence on the record considered as a whole shall in like manner be conclusive." As said in Universal Camera Corp. v. N.L.R.B., 1951, 340 U.S. 474, 488, 71 S.Ct. 456, 465, 95 L.Ed. 456:

"To be sure, the requirement for canvassing 'the whole record' in order to ascertain substantiality does

[1] "A. Interference, restraint, and coercion

"As developed more fully, *infra*, the Union called a strike in May 1955 over what it regarded as the Company's failure to bargain in good faith. Shortly before the strike Foreman Evetts asked Employee Lopez 'to help [Evetts] destroy the Union,' adding, 'If we destroy it, I will give you a raise' (R. 203; B.A. 30). In response to Lopez' questions, Evetts went on to say: 'I am authorized by Mr. Johnny White [petitioner's managing partner] to do this. You and I can destroy this if you will only help me * * * I will go bring a paper and get signatures and we will destroy it' (R. 203; B.A. 30). In similar vein, Evetts told Employee Vara after the strike started that if Vara signed a certain paper, Evetts 'would raise [Vara's] salary' and if they 'could find a few more that would sign, he could destroy the Union' (R. 202–203; B.A. 27). Also after the strike started, Evetts went to the homes of Employees Lopez and Hernandez and offered each a raise in pay if he would abandon the strike and return to work (R. 202, 203–204; B.A. 20, 31). The day the strike began, Superintendent Tracey asked Employee Norred if he was going on strike, and on receiving an affirmative answer warned Norred, who lived in a Company-owned house, that he 'better start looking' for another house (R. 201–202; B.A. 13–14).

"The Board found that by the above-described conduct the Company, acting through Foreman Evetts and Superintendent Tracey, interfered with, restrained, and coerced employees in the exercise of their right under Section 7 to engage in union and concerted activities, thereby violating Section 8(a) (1) of the Act (R. 206–207)."

not furnish a calculus of value by which a reviewing court can assess the evidence. Nor was it intended to negative the function of the Labor Board as one of those agencies presumably equipped or informed by experience to deal with a specialized field of knowledge, whose findings within that field carry the authority of an expertness which courts do not possess and therefore must respect. Nor does it mean that even as to matters not requiring expertise a court may displace the Board's choice between two fairly conflicting views, even though the court would justifiably have made a different choice had the matter been before it *de novo.*"

Speaking on the issue of a failure to bargain in good faith in the more recent case of N.L.R.B. v. Truitt Mfg. Co., 1956, 351 U.S. 149, 152, 153, 154, 76 S. Ct. 753, 755, 100 L.Ed. 1027, the Court said:

" * * * While Congress did not compel agreement between employers and bargaining representatives, it did require collective bargaining in the hope that agreements would result. * * *

"The Board concluded that under the facts and circumstances of this case the respondent was guilty of an unfair labor practice in failing to bargain in good faith. We see no reason to disturb the findings of the Board. We do not hold, however, that in every case in which economic inability is raised as an argument against increased wages it automatically follows that the employees are entitled to substantiating evidence. Each case must turn upon its particular facts. The inquiry must always be whether or not under the circumstances of the particular case the statutory obligation to bargain in good faith has been met. Since we conclude that there is support in the record for the conclusion of the Board here that respondent

did not bargain in good faith, it was error for the Court of Appeals to set aside the Board's order and deny enforcement."

The dissenting Justices, speaking through Mr. Justice Frankfurter, did not disagree on this principle:

"These sections obligate the parties to make an honest effort to come to terms; they are required to try to reach an agreement in good faith. 'Good faith' means more than merely going through the motions of negotiating; it is inconsistent with a predetermined resolve not to budge from an initial position. But it is not necessarily incompatible with stubbornness or even with what to an outsider may seem unreasonableness. A determination of good faith or of want of good faith normally can rest only on an inference based upon more or less persuasive manifestations of another's state of mind. The previous relations of the parties, antecedent events explaining behavior at the bargaining table, and the course of negotiations constitute the raw facts for reaching such a determination. The appropriate inferences to be drawn from what is often confused and tangled testimony about all this makes a finding of absence of good faith one for the judgment of the Labor Board, unless the record as a whole leaves such judgment without reasonable foundation. See Universal Camera Corp. v. National Labor Relations Board, 340 U.S. 474 [71 S.Ct. 456, 95 L.Ed. 456]."

Dissenting opinion, 351 U.S. at pages 154-155, 76 S.Ct. at page 757.

Certainly, against the background evidenced by the other violations, the record as a whole discloses a rational basis, a reasonable foundation for the Board's conclusion that the Company failed to bargain in good faith. This Court should not substitute its judgment for that of the Board.

Collective bargaining is at the very heart and core of the Labor Management Relations Act. If, in any particular case, effective collective bargaining is not had and cannot be required, then in that case the Act is nothing. It follows that there must be some protection against "merely going through the motions of negotiating," [2] "a predetermined resolve not to budge from an initial position," [3] "surface bargaining" accompanied by "a purpose to defeat it and wilful obstruction of it," [4] "shadow boxing to a draw," [5] "giving the Union a runaround while purporting to be meeting with the Union for the purpose of collective bargaining." [6]

Nowhere has the rule been better stated than by Judge Russell for this Circuit in Majure v. National Labor Relations Board, 5 Cir., 1952, 198 F.2d 735, 739:

"* * * It is true, of course, that the employer was not required to accept the union's proposal, nor to make any concession, or counter-proposal. However, the employer was required to bargain in good faith. This Court held in American National Insurance Co. v. N.L.R.B., 5 Cir., 187 F.2d 307, affirmed by the Supreme Court in N.L.R.B. v. American National Insurance Co., 343 U.S. 395, 72 S.Ct. 824. [96 L.Ed. 1027], that the obligation of the employer to bargain in good faith does not require the yielding of positions fairly maintained, nor permit the Board, under the guise of a finding of bad faith, to require the employer to contract in a way which the Board might deem proper. Nevertheless, the requirement of good faith in such bargaining is imposed by the statute. The dividing line between the right to the exercise of good faith and independent judgment and to maintain the resultant position with firmness, with no obligation of retreat, and nevertheless obey the statutory command to bargain in good faith must, in the nature of such right, and yet obligation, be frequently difficult of ascertainment and establishment. It has not been easy in the present case. In such cases there is danger that the negotiating parties may have their freedom of contract as to substance restricted or destroyed by a construction of their conduct as an evidence of bad faith. However, judicial ingenuity has devised but one standard, or test, which, recognizing the problem, yet seeks to insure reconciliation of privilege and obligation. This rule requires fair appraisal of the circumstances and the particular facts of the particular case. N.L.R.B. v. American National Insurance Company, supra.

"Applying the rule here, we think the circumstances of this case support the Board's finding that the employer, while freely conferring, did not approach the bargaining table with an open mind and purpose to reach an agreement consistent with the respective rights of the parties."

Chief Judge Magruder, speaking for the First Circuit in N.L.R.B. v. Reed & Prince Mfg. Co., 1953, 205 F.2d 131, 134, 135, made an admirable expression of the same principle:

"It is true, as stated in N.L.R.B. v. American National Ins. Co., 1952, 343 U.S. 395, 404, 72 S.Ct. 824, 829, 96 L.Ed. 1027, that the Board may not 'sit in judgment upon the sub-

2. Dissenting opinion in N.L.R.B. v. Truitt Mfg. Co., 1956, 351 U.S. 149, 154, 76 S.Ct. 753, 100 L.Ed. 1027.

3. Ibid.

4. N.L.R.B. v. Whittier Mills Co., 5 Cir., 1940, 111 F.2d 474, 478, per Judge Sibley.

5. Stonewall Cotton Mills v. N.L.R.B., 5 Cir., 1942, 129 F.2d 629, 631, per Judge Hutcheson.

6. N.L.R.B. v. Athens Mfg. Co., 5 Cir., 1947, 161 F.2d 8.

stantive terms of collective bargaining agreements.' But at the same time it seems clear that if the Board is not to be blinded by empty talk and by the mere surface motions of collective bargaining, it must take some cognizance of the reasonableness of the positions taken by an employer in the course of bargaining negotiations. See Wilson & Co., Inc., v. N.L.R.B., 8 Cir., 1940, 115 F.2d 759, 763. See also Smith, The Evolution of the 'Duty to Bargain' Concept in American Law, 39 Mich. L.Rev. 1065, 1108 (1941). Thus if an employer can find nothing whatever to agree to in an ordinary current-day contract submitted to him, or in some of the union's related minor requests, and if the employer makes not a single serious proposal meeting the union at least part way, then certainly the Board must be able to conclude that this is at least some evidence of bad faith, that is, of a desire not to reach an agreement with the union. In other words, while the Board cannot force an employer to make a 'concession' on any specific issue or to adopt any particular position, the employer is obliged to make *some* reasonable effort in *some* direction to compose his differences with the union, if § 8(a) (5) is to be read as imposing any substantial obligation at all."

Chief Judge Chase, speaking for the Second Circuit in N.L.R.B. v. Century Cement Mfg. Co., 1953, 208 F.2d 84, 86, said:

" * * * The respondent made no proposals of its own as a basis for negotiation on such subjects. They were all, however, proper subjects for collective bargaining and while the respondent was, indeed, free to reject the union's demands in the exercise of its business judgment the failure to do little more than reject them was indicative of a failure to comply with its statutory requirement to bargain in good faith."

Under all of the authorities, in determining whether *either* an employer or a labor organization has failed to bargain in good faith, the Board must necessarily consider its conduct at the bargaining table, and whether its has acted reasonably or arbitrarily.

In the present case, the Company insisted on a no-strike clause with provisions for Union liability in the case of breach. It further insisted that matters going to arbitration must be decided in the Company's favor if there is any evidence that the Company's position was not arbitrary or capricious. It declined to accede to any proposal for the selection of a neutral arbitrator in the event the arbitrators chosen by the Union and the Company could not agree. While thus insisting that the Union waive its statutory right to strike, the Company declined to give any substitute, such as effective arbitration. In the recent case of Textile Workers Union of America v. Lincoln Mills, 1957, 353 U.S. 448, 455, 77 S.Ct. 912, 917, 1 L.Ed.2d 972, the Supreme Court said: "Plainly the agreement to arbitrate grievance disputes is the *quid pro quo* for an agreement not to strike."

Even without a contract, the Company could not lawfully change its wage rates, grant merit increases, or alter shop rules relating to working conditions without first bargaining with the Union. Nevertheless, the Company insisted that the Union surrender its right to bargain about those matters and leave the Company free to act as it saw fit. There are many other instances of arbitrary and unreasonable action set forth in the fair and careful intermediate report of the Trial Examiner and the decision of the Board, which leave me convinced that the Board had a rational basis for its conclusion that the Company failed to bargain in good faith. The other violations on the part of the Company make that conclusion all the more reasonable. In my opinion, that is a conclusion peculiarly within the province of the Board and which the Board is more competent

574

to arrive at than is this Court. I, therefore, respectfully dissent.

On Petition for Rehearing.

PER CURIAM.

In its motion for rehearing the Board takes exception to our statement in the opinion referring to merit increases to five of the sixty employes: "These were not such general increases as were criticized in N.L.R.B. v. Crompton-Highland Mills [337 U.S. 217, 69 S.Ct. 960, 93 L.Ed. 1320]." The Board states: "With all deference, we respectfully submit that the Court erred in thus holding that an employer may grant individual merit increases without first negotiating with the statutory bargaining representative."

Lest there be a misunderstanding, we state that we did not intend to, and did not, "thus hold." We found that these particular increases were in line with company policy to make merit increases, they had all accrued before bargaining sessions commenced, and on the record as a whole they did not amount to violations of either Section 8(a) (1) or Section 8(a) (3), of the Act. We contrasted this situation to that where there were *general* increases in the cases cited by general counsel in his brief.

The motion for rehearing is denied.

RIVES, Circuit Judge (dissenting).

I dissent. Individual merit increases as well as general increases must be negotiated with the bargaining representative.[1]

Further, I agree with the examiner's finding, adopted by the Board, that the nature of the 8(a) (1) violations were such as to show that, at the time the Company was going through the motions of collective bargaining, it was also seeking to destroy the Union. Still further and of more importance, the Board properly concluded, I think, that the Company failed to bargain in good faith.

---

1. N.L.R.B. v. J. H. Allison & Co., 6 Cir., 1948, 165 F.2d 766, 3 A.L.R.2d 990; N.L.R.B. v. Berkley Machine Works, 4 Cir., 1951, 189 F.2d 904, 907–908, 911; Armstrong Cork Co. v. N.L.R.B., 5 Cir., 1954, 211 F.2d 843, 847; cf. J. I. Case Co. v. N.L.R.B., 1944, 321 U.S. 332, 338–339, 64 S.Ct. 576, 88 L.Ed. 762; Order of Railroad Telegraphers v. Railway Express Agency, 1944, 321 U.S. 342, 346, 64 S.Ct. 582, 88 L.Ed. 788; N.L.R.B. v. Wooster Division of Borg-Warner Corp., 78 S.Ct. 718.