320 F.2d 615
 INDUSTRIAL UNION OF MARINE AND SHIPBUILDING WORKERS OF AMERICA, AFL-CIO, Petitioner,
v.
NATIONAL LABOR RELATIONS BOARD, Respondent
Bethlehem Steel Company (Shipbuilding Division), Intervenor.
BETHLEHEM STEEL COMPANY (SHIPBUILDING DIVISION), Petitioner,
v.
NATIONAL LABOR RELATIONS BOARD, Respondent
Industrial Union of Marine and Shipbuilding Workers of America, AFL-CIO, Intervenor.
 No. 14052.
 No. 14102.
 United States Court of Appeals Third Circuit.
 Argued May 21, 1963.
 Decided July 30, 1963.
 
 M. H. Goldstein, Philadelphia, Pa. (Goldstein & Barkan, Michael Brodie, Philadelphia, Pa., on the brief), for petitioner, Industrial Union of Marine and Shipbuilding Workers of America, AFL-CIO.
 John H. Morse, New York City (Frank Cummings, New York City, Cravath, Swaine & Moore, New York City, on the brief), for Bethlehem Steel Co. (Shipbuilding Division).
 Nancy M. Sherman, Washington, D. C. (Stuart Rothman, Gen. Counsel, Dominick L. Manoli, Assoc. Gen. Counsel, Marcel Mallet-Prevost, Asst. Gen. Counsel, James C. Paras, Atty., N. L. R. B., on the brief), for National Labor Relations Board.
 Before STALEY, HASTIE and SMITH, Circuit Judges.
 STALEY, Circuit Judge.
 
 
 1
 The National Labor Relations Board has found that the Bethlehem Steel Company (Shipbuilding Division) violated § 8(a) (5) and (1) of the National Labor Relations Act.[1] The case is here on petitions for review filed by both the company and the charging union, Industrial Union of Marine and Shipbuilding Workers of America, AFL-CIO, and on the cross-petition of the Board for enforcement of its order. The employer asserts that the Board's findings are unwarranted, while the union contends that the Board should have found additional violations.
 
 
 2
 The circumstances giving rise to this proceeding occurred during the summer of 1959 when Bethlehem and the union were negotiating a new collective bargaining agreement to cover hourly-paid employees at the company's east coast shipyards.[2] A prior agreement, executed in 1956, had an expiration date of July 31, 1959. The union made an oral presentation of its bargaining demands on July 7, 1959. These included, among others, a proposed change in the formula for adjusting wages to the cost of living, increases in premium pay and vacation benefits, an extension of the scope of the arbitration clause, and changes which would give an increased emphasis to seniority in determining layoffs. The following day the company presented its proposed new contract (described as the White Book in the record), together with a written statement explaining its position. This detailed plan included elimination of the cost of living adjustment, a reduction in premium pay, limitations on the scope of the arbitration clause, and alterations in the grievance procedure. The latter contained a clause requiring the signature of each employee involved before a grievance could be processed. The reason assigned for this was that "under our current agreement we have been flooded with grievances." The thrust of the company's explanatory statement was that competitive conditions necessitated these proposals. Discussion of the basic wage structure was postponed pending resolution of these issues.
 
 
 3
 The parties conferred frequently during the next few weeks but there was little progress in the bargaining. The company stressed the economic cost of the union's proposals, while the latter rejected this argument on the ground that the employer was not in a competitive business to any substantial degree. On July 28, 1959, Bethlehem informed the union that if no agreement were reached by July 31 (the termination date of the 1956 contract), it would discontinue the grievance and arbitration procedure provided for in the old contract, would no longer give preferential seniority to union representatives, and would not comply with the union shop and checkoff clauses. Since no agreement was reached by August 1st, this was done.
 
 
 4
 On August 11, the company informed the union and the employees that it was putting into effect all of its White Book proposals with respect to the hourly-paid unit, except, inter alia, those relating to arbitration, preferential seniority, and the union shop and checkoff. This plan was effectuated August 13, 1959. A strike followed in January 1960, and was still in existence at the time of the hearing before the trial examiner in March of that year.
 
 
 5
 The trial examiner found that Bethlehem had violated § 8(a) (5) and (1) by insisting on the clause requiring the signature of individual employees on grievances. However, he concluded that none of the other acts of the company were unlawful, and further determined that the employer was not guilty of subjective bad faith in its course of conduct throughout the negotiations. The unilateral changes of August 13 were held not to constitute an unfair labor practice because the parties by this time had reached an impasse in bargaining.
 
 
 6
 Initially, the Board adopted the conclusions and recommendations of the trial examiner. 133 N.L.R.B. 1347 (1961). However, in a supplemental decision, 136 N.L.R.B. 1500 (1962), it found that the company had also violated § 8(a) (5) by depriving union representatives of their seniority rights and by unilaterally abandoning the grievance procedure of the expired contract and substituting its own procedure in lieu thereof. The Board adhered to its prior conclusion that the totality of Bethlehem's conduct did not evince bad faith bargaining.
 
 
 7
 At the threshold, Bethlehem urges that it was relieved of any obligation to bargain with the union because the latter's demands covered an inappropriate unit, i. e., one which included personnel classifiable as supervisors, and thus not within the purview of the statute. See 29 U.S. C.A. § 152(3). This challenge relates to the union's proposal that the bargaining unit include both hourly-paid and salaried "snappers". The parties had agreed in the 1956 contract that the former should be included and the latter excluded. Bethlehem now asserts that both are supervisors.
 
 
 8
 We agree, as did the Board, with the trial examiner that "this is more an apparent than a real issue in this case," and that "placement of the snappers could in no event affect any of the issues raised by the complaint." Indeed, as the examiner noted, "The Respondent [Bethlehem] also conceded that whether the snappers in question be included in the bargaining unit or excluded, in either event the Union in fact represented a majority of the employees at all times, as it does now." In these circumstances, we think the employer's position is not tenable. Brewery & Beverage Drivers Local 67 v. NLRB, 103 U.S.App.D.C. 190, 257 F.2d 194 (1958).
 
 
 9
 Bethlehem's more fundamental contentions are that its grievance-signatory plan, and its discontinuance of preferential seniority for union officials and abandonment of the grievance and arbitration machinery at the expiration of the 1956 agreement did not violate the statute.
 
 
 10
 With respect to the grievance-signatory plan, the company advances two arguments: (1) there is no evidence that this was made a condition of reaching agreement; and (2) the proposal is a mandatory subject of bargaining. The record and the findings of the trial examiner make it abundantly clear that Bethlehem vigorously insisted that the substance of this proposal be incorporated in any new labor contract. But the employer urges that at no time did it state that this was a sine qua non of agreement. It says that since, as hereinafter more fully discussed, the Board found that there was an impasse on all disputed matters, it could not have concluded that insistence on this particular clause barred an accord.
 
 
 11
 The argument does not withstand analysis. It was not necessary for the Board to find that the company's insistence on this proposal was the sole cause of the failure to reach agreement. If the proposal is not a mandatory bargaining subject, insistence upon it was a per se violation of the duty to bargain. NLRB v. Wooster Division of Borg-Warner Corp., 356 U.S. 342, 78 S.Ct. 718, 2 L.Ed.2d 823 (1958); NLRB v. Davison, 318 F.2d 550 (C.A. 4, 1963). Any other rule would permit insistence upon a nonmandatory item so long as there were any dispute as to mandatory topics. As the Supreme Court held in Borg-Warner, 356 U.S. at 349, 78 S.Ct. at 722:
 
 
 12
 "We agree with the Board that such conduct [insistence on a nonmandatory topic] is, in substance, a refusal to bargain about the subjects that are within the scope of mandatory bargaining."
 
 
 13
 We turn now to the second aspect of the employer's argument on this point, i.e., the proposal is a mandatory bargaining subject. In accordance with § 8(d) of the Act,[3] the Supreme Court has defined mandatory subjects as those within the phrase "wages, hours, and other terms and conditions of employment." NLRB v. Katz, 369 U.S. 736, 82 S.Ct. 1107, 8 L.Ed.2d 230 (1962); NLRB v. Wooster Division of Borg-Warner Corp., supra. It is clear to us that Bethlehem's proposal does not come within the scope of that phrase. Although at first glance it might appear to be a "condition of employment," actually the effect of the proposal is to limit the union's representation of the employees and not to condition the employees' employment. Cf. NLRB v. Davison, supra.
 
 
 14
 Under § 9(a) the union is the exclusive representative of the employees "in respect to rates of pay, wages, hours of employment, or other conditions of employment." 29 U.S.C.A. § 159(a). Bethlehem's proposal which would restrict the union's role in the prosecution of grievances to those complaints which had been signed by individual employees clearly limits this representation. The company acknowledges the union's rights with respect to the prosecution of grievances, but seeks solace in the proviso to § 9(a) which grants individual employees the right to adjust grievances without the intervention of the representative so long as the adjustment is not inconsistent with the collective bargaining contract.
 
 
 15
 We find nothing in this section to support the company's position. Indeed, the proviso itself requires that the union be given opportunity to be present at the adjustment. In short, the fact that individual employees have the right to adjust their own grievances does not mean that an employer can restrict the union's statutory rights by requiring that each grievance be signed by the employee involved. Such a limitation is not within the statutory definition of mandatory bargaining subjects. Like the pre-strike ballot clause in Borg-Warner, "it substantially modifies the collective-bargaining system provided for in the statute by weakening the independence of the `representative' chosen by the employees. It enables the employer, in effect, to deal with its employees rather than with their statutory representatives." 356 U.S. at 350, 78 S.Ct. at 723. As the Board cogently points out in its brief, such a clause would preclude the union from prosecuting flagrant violations of the contract merely because the employee involved, due to fear of employer reprisals, or for similar reasons, chose not to sign a grievance. Hence, redress for a violation would be made contingent upon the intrepidity of the individual employee.
 
 
 16
 The fact that there are other labor contracts in this industry requiring employee signatures on grievances is not significant. Non-mandatory subjects may lawfully be included in collective bargaining contracts if the parties agree to them. NLRB v. Wooster Division of Borg-Warner Corp., 356 U.S. at 349, 78 S.Ct. at 722. Bethlehem's reliance on Elgin, Joliet & Eastern Railway v. Burley, 325 U.S. 711, 65 S.Ct. 1282, 89 L.Ed. 1886 (1945), aff'd, 327 U.S. 661, 66 S.Ct. 721, 90 L.Ed. 928 (1946), is misplaced. That case simply holds that a bargaining representative can compromise accrued monetary claims of individual employees only if the employees have authorized it to do so.
 
 
 17
 The Board concluded that Bethlehem did not violate the statute when, upon the expiration of the 1956 agreement, it discontinued enforcement of the union shop and checkoff. In this court the union does not seriously press its contention that this was error. In any event, we agree with the reasoning of the Board. The right to require union membership as a condition of employment is dependent upon a contract which meets the standards prescribed in § 8(a) (3). The checkoff is merely a means of implementing union security. Since there was no contract in existence when the company discontinued these practices, its action was in conformity with the law. Cf. NLRB v. International Union, United Automobile Workers, 297 F.2d 272 (C.A. 1, 1961); Communications Workers v. NLRB, 215 F.2d 835, 839 (C.A. 2, 1954). Moreover, the checkoff clause of the 1956 contract expressly provided that it should remain in effect only so long as the agreement was extant.
 
 
 18
 Bethlehem makes a tripartite challenge to the Board's determination that the company violated § 8(a) (5) by unilaterally abrogating the preferential seniority rights of union representatives and by altering the prior grievance procedure. It urges that its action was a legitimate use of economic pressure, that these matters are not mandatory bargaining subjects, and that they, like the union shop and checkoff provisions, cannot be enforced unless there is an agreement in effect.
 
 
 19
 Clearly, the first argument is contingent upon the validity of the second, i.e., whether the company made a permissible use of economic weapons depends upon whether these matters are mandatory bargaining subjects, and thus not subject to unilateral change.
 
 
 20
 We agree with the Board that both seniority rights and a grievance procedure are within the phrase "wages, hours, and other terms and conditions of employment" and hence are mandatory bargaining subjects.[4] NLRB v. Proof Co., 242 F.2d 560 (C.A. 7, 1957) (seniority); NLRB v. Century Cement Mfg. Co., 208 F.2d 84 (C.A. 2, 1953) (grievance procedure and seniority). See also, United Steelworkers v. Warrior & Gulf Navigation Co., 363 U.S. 574, 577-585, 80 S.Ct. 1347, 4 L.Ed.2d 1409 (1960); Ford Motor Co. v. Huffman, 345 U.S. 330, 336-337, 73 S.Ct. 681, 97 L.Ed. 1048 (1953); Aeronautical Industrial District Lodge 727 v. Campbell, 337 U.S. 521, 528, 69 S. Ct. 1287, 93 L.Ed. 1513 (1949); Annot. 12 A.L.R.2d 265, 272-273. Accordingly, the company's unilateral action with respect to them was unlawful. NLRB v. Katz, 369 U.S. 736, 82 S.Ct. 1107, 8 L.Ed. 2d 230 (1962). The fact that there was no agreement in effect at the time does not alter our conclusion. As we have previously stated, Bethlehem was justified in discontinuing enforcement of the union shop and checkoff because these conditions are wholly dependent upon the existence of an agreement conforming to the § 8(a) (3) proviso. The company's abrogation of seniority rights and its alteration in the grievance and arbitration procedure, however, finds no such protection in the statute. The vice in this was not the refusal to comply with the provisions of an agreement which had already expired, but the unilateral elimination of accrued seniority rights, and the substitution of a new employer-devised grievance procedure in lieu of the one which existed under the expired contract.
 
 
 21
 Two additional contentions of the employer merit only brief comment. It is said that because the union was given notice of these proposed changes and an opportunity to bargain with respect thereto, Bethlehem was justified in implementing them on August 1st. But the employer concedes that it was not until July 28 that the union was notified that these changes were to be effected only three days later. Until that time the company's own proposed contract included provisions for preferential seniority and a formal grievance procedure. In this setting, it can hardly be said that the union was given the bargaining opportunity to which it is entitled under NLRB v. Katz, 369 U.S. 736, 82 S.Ct. 1107, 8 L.Ed.2d 230 (1962); and NLRB v. Crompton-Highland Mills, Inc., 337 U. S. 217, 69 S.Ct. 960, 93 L.Ed. 1320 (1949). Similarly wanting in merit is the argument that the changes were permissible because "purely temporary and not for the purpose of effecting a permanent change in terms of employment, but for the purpose of putting legitimate economic pressure on the Union." Regardless of how characterized, the changes altered conditions of employment and were therefore unlawful.
 
 
 22
 The union urges that the company's unilateral imposition of the White Book on August 13, 1959, constituted a per se violation of § 8(a) (5). Additionally it makes a broad frontal attack on the failure of the Board to find Bethlehem guilty of bad faith bargaining during the entire course of the 1959 negotiations. Because we hold that the Board's determination that Bethlehem was legally justified in imposing its own terms and conditions of employment on August 13 was premised on an erroneous view of the law, we find it unnecessary to consider the union's alternative argument.
 
 
 23
 The Board concedes that the employer's action of August 13 would ordinarily constitute a violation of the Act as a matter of law. NLRB v. Katz, 369 U.S. 736, 82 S.Ct. 1107, 8 L.Ed.2d 230 (1962); NLRB v. Crompton-Highland Mills, Inc., 337 U.S. 217, 69 S.Ct. 960, 93 L.Ed. 1320 (1949); May Dept. Stores Co. v. NLRB, 326 U.S. 376, 66 S.Ct. 203, 90 L.Ed. 145 (1945); Quaker State Oil Refining Corp. v. NLRB, 270 F.2d 40, 45-46 (C.A. 3), cert. denied, 361 U.S. 917, 80 S.Ct. 261, 4 L.Ed.2d 185 (1959); NLRB v. George P. Pilling & Son Co., 119 F.2d 32, 38 (C.A. 3, 1941). It urges, however, that the parties by this time had reached a bargaining impasse, thereby justifying unilateral action.[5] But it is manifest that there can be no legally cognizable impasse, i.e., a deadlock in negotiations which justifies unilateral action,[6] if a cause of the deadlock is the failure of one of the parties to bargain in good faith. NLRB v. Yutana Barge Lines, Inc., 315 F.2d 524, 529-530 (C.A. 9, 1963); NLRB v. Herman Sausage Co., 275 F.2d 229, 234 (C.A. 5, 1960); NLRB v. Andrew Jergens Co., 175 F.2d 130, 136 (C.A. 9, 1949); Vanneette Hosiery Mills, 114 N.L.R.B. 1107, 1126 (1955). See also, NLRB v. Crompton-Highland Mills, Inc., supra, and Bowman, An Employer's Unilateral Action — An Unfair Labor Practice?, 9 Vand.L.Rev. 487, 501 (1955-1956). Here, the company was guilty of acts which the Board forcefully contends, and we have held, to be a violation of its duty to bargain less than two weeks before the August 13 changes. Not only was this prior action unlawful, but it consisted of the very conduct, a unilateral alteration in the conditions of employment, which the Board now asserts was justified on August 13.
 
 
 24
 The sole reason advanced for the finding of an impasse is that the union had also adopted an attitude of "fixed and stoney inflexibility" and that, "[a]s the days wore on, adamancy only became stronger and stronger." In the words of the trial examiner:
 
 
 25
 "With this sort of testimony by the Union witnesses themselves, and the complete failure to reach agreement on anything worth speaking about after all these negotiating sessions, there is no doubt that the parties were finished with talking. They were at an absolute impasse."
 
 
 26
 But it is not contended that the union's adamant position was in any sense a violation of its duty to bargain. Indeed, in view of the company's unlawful insistence on its grievance-signatory plan and its unilateral alteration of the conditions of employment on August 1st, the union's position was completely justified. In this regard, our decision in NLRB v. International Ladies' Garment Workers' Union, 274 F.2d 376, 78 A.L.R.2d 963 (C.A. 3, 1960), is particularly apposite. We there held that a union was justified not merely in maintaining an adamant position at the bargaining table, but in refusing to negotiate with a representative of an employer's association who had previously held union office. Thus the Board in this case failed to view the union's inflexible position and the August 13 imposition of the White Book in the light of the company's prior violations of its duty to bargain.
 
 
 27
 Despite its determination that the company's action of August 1st was so inimical to our national labor relations policy as to constitute a per se violation of the Act, the Board now contends that this was only a "technical violation." But such a euphemistic description cannot be so easily employed to reconcile the inconsistency in logic in the Board's decision. The fact remains that the August 1st changes were unfair labor practices as a matter of law. Moreover, not only had the company not purged itself of its earlier violations by the time it implemented the White Book on August 13, but it concedes, and the record shows, that it did not institute its new grievance plan until that very day.
 
 
 28
 There are additional factors which conclusively refute the Board's contention, pressed at oral argument, that the "technical" violations of August 1st were innocently committed. In a prior case the Board held that Bethlehem had violated § 8(a) (5) in 1947 by insisting on a proposal which would give each employee the right to take up a grievance with his foreman without the union steward being present. In the Matter of Bethlehem Steel Company, Shipbuilding Division, 89 NLRB 341, (1950), reversed on other grounds, Bethlehem Steel Co. v. NLRB, 191 F.2d 340 (D.C.Cir. 1951). A stipulation of the parties reveals that in 1956 the company suspended the seniority rights of union officials as well as the procedure for the adjustment of grievances. The union thereupon filed unfair labor practice charges. When a new contract was executed these charges were withdrawn pursuant to a memorandum of agreement. Considering the similarity between its prior conduct and that presented here, it cannot be said that the company was unaware of the questionable nature of its action.
 
 
 29
 The Board cites NLRB v. Katz, 369 U. S. 736, 741-742, 82 S.Ct. 1107, 8 L.Ed.2d 230 (1962), for the proposition that whether an impasse exists is a question of fact for its determination. Certainly whether the parties have reached a deadlock in negotiations is a factual matter, but whether such a deadlock legally justifies a unilateral alteration in the conditions of employment is at the very least a mixed question of law and fact.
 
 
 30
 The union urges that we direct the Board to include in its order a "back pay" award to those employees who were injured by the company's action. However, because we hold only that the Board erred in law in failing to give proper consideration to the circumstances, particularly the unfair labor practices, which preceded the imposition of the White Book, we shall remand the case for further consideration in the light of this opinion. Of course, this is to include the issuance of an order which will effectuate the policies of the Act.
 
 
 31
 The petition for enforcement will be denied and the cause remanded for further proceedings in conformity with this opinion.
 
 
 
 Notes:
 
 
 [1]
 "§ 158. Unfair labor practices
 "(a) It shall be an unfair labor practice for an employer —
 "(1) to interfere with, restrain, or coerce employees in the exercise of the rights guaranteed in section 157 of this title;
 * * * * * *
 "(5) to refuse to bargain collectively with the representatives of his employees, subject to the provisions of section 159(a) of this title." 29 U.S.C.A. § 158.
 
 
 [2]
 Negotiations covering salaried employees were also being conducted at this time, but since these were largely contingent upon the discussions concerning the hourly-paid employees, we shall concern ourselves only with the hourly-paid unit
 
 
 [3]
 "§ 158. Unfair labor practices
 * * * * * *
 "(d) For the purposes of this section, to bargain collectively is the performance of the mutual obligation of the employer and the representative of the employees to meet at reasonable times and confer in good faith with respect to wages, hours, and other terms and conditions of employment * * *." 29 U.S.C.A. § 158.
 
 
 [4]
 The Board properly rejected the examiner's holding that these topics, though mandatory bargaining subjects, are not terms and conditions of employment. As we have previously indicated, the latter is merely a part of the statutory definition of the former
 
 
 [5]
 In addition to contesting the Board's finding on this score, the union argues that the necessary inference in it is that the impasse arose between August 1 and August 11. The basis for this is that if there were a bona fide impasse prior to August 1, the Board could not have found that Bethlehem violated the Act by its actions on that date. In its brief the Board questions this rationale, but at oral argument counsel for the Board was unable to state at what point the impasse occurred. Because of our decision, we find it unnecessary to determine this issue. We might note, however, that logic supports the union's position
 
 
 [6]
 Although the parties have used the termimpasse rather loosely to describe any deadlock in negotiations, regardless of how caused, we shall employ it in this opinion only in this strict legal sense.